CITY AND COUNTY OF HONOLULU, A MUNICIPAL CORPORATION *v.* GEORGE MILES COLLINS, JOHN KIRKWOOD CLARKE, FRANK ELBERT MIDKIFF, AND EDWIN PUAHAULANI MURRAY, TRUSTEES UNDER THE WILL AND OF THE ESTATE OF BERNICE PAUAHI BISHOP, DECEASED, ET AL.

No. 3013.

ARGUED APRIL 30, 1957.     DECIDED NOVEMBER 21, 1957.

RICE, C. J., STAINBACK AND MARUMOTO, JJ.

200

OPINION OF THE COURT BY RICE, C. J.

The City and County of Honolulu, a municipal corporation, as plaintiff, instituted a proceeding in eminent domain to condemn and so acquire property in the Haiku valley on the windward side of the island of Oahu, for the purpose of construction, development, extension and improvement of the Kaneohe-Kailua water system.

The petition was filed on July 19, 1940. After preliminary matters were disposed of in the intervening period, trial in the circuit court, first circuit, without jury, was commenced on July 14, 1953.

The parties to the trial were the said City and County of Honolulu, as plaintiff, subsequently appellant, and three groups of defendants, subsequently appellees, respectively: (a) the trustees of the Estate of Bernice Pauahi Bishop, Deceased, hereinafter referred to as Bishop Estate; (b) Helen S. Davis, assignee of Alan S. Davis; Alice H. Cooke, assignee of J. Platt Cooke; the personal representatives of George G. Fuller, deceased, and the personal representatives of Wilhelmina Tenney, deceased, herein-

after referred to as the "lessees," successors in interest of Alan S. Davis, George G. Fuller, J. Platt Cooke, and Wilhelmina Tenney, who were lessees under a lease from Bishop Estate for a term of 49½ years from April 1, 1908, expiring September 30, 1957, of a tract of land (ahupuaa of Heeia) wherein is included lands of the Bishop Estate involved herein (Parcel 199, 535 acres and Parcel 200, that of the easement) ; and (c) the executors under the will and of the estate of Walter R. Coombs, deceased, substituted for him, with Genevra E. Coombs, as his widow, continuing in her individual capacity.

The only issue was the question of the fair market value of the property, condemned and taken by appellant, which included a tract of land, containing 535 acres (Parcel 199), owned in fee simple by said Bishop Estate, together with an easement over, under, through and across likewise owned land (Parcel 200) ; also, a kuleana of 4.8 acres (Parcel 196) which was at the time of the filing of the petition owned by Walter R. and Genevra E. Coombs.

The Bishop Estate lands (Parcel 199, of 535 acres, and that for the easement, Parcel 200) are part of the ahupuaa of Heeia, Oahu, the whole of which ahupuaa—excepting, possibly, kuleanas within the boundaries thereof—is owned by the Bishop Estate.

The 535-acre Parcel 199 was in forest reserve, was undeveloped, and was held and used as a watershed.

By stipulation between Genevra E. Coombs, his widow, and the executors under the will and of the estate of Walter R. Coombs, deceased, which was dated August 7, 1953, and was on August 25, 1953, received in evidence as defendants' exhibit number 35, it was agreed, by and between such group "(c)" of defendants that, *inter alia,* "not withstanding any possibility of ultimate adverse interest between said parties" thereto, that all of the proceeds of any final judgment which might be recovered by such

parties or any of them in this said proceeding should be paid to Bishop Trust Company, Limited, a Hawaii trust corporation, as the escrow agent for each and all of the parties to the stipulation; the escrow agent was authorized in the name and on behalf of each and all of the parties to the stipulation to receive and collect the proceeds of any final judgment from the City and County of Honolulu or the clerk of the first circuit court, Territory of Hawaii, and to give good and sufficient receipts therefor, which would be final and binding upon each and all of the parties to the stipulation and their successors, legal representatives and assigns, and that in the instant proceeding the court should not determine which of them, said executors and said Genevra Coombs, is entitled to the judgment or any portion thereof granted in this proceeding "for the taking of any said parcels 187 and 196 or any interest in any of them," but should give judgment in favor of said executors and said Genevra E. Coombs, collectively, for such taking, subject to the stipulation.

By agreement between the attorneys, respectively for the Bishop Estate—to wit, for the trustees of said estate as group "(a)" of the defendants in the proceeding—and for group "(b)," hereinbefore referred to as the "lessees," which agreement was expressed orally and so announced in open court at the trial, "the matter of the apportionment of the award, whatever it may [might] be, as between the lessees and the Bishop Estate will [would] be left over for further determination, the County [City and County of Honolulu, plaintiff] having no interest in that." The trial court was informed that such agreement was made with the thought that possibly the attorneys could work out the apportionment between themselves, but otherwise it might be necessary to take some evidence on that issue.

Regard being had for the stipulation pertinent to the

Coombs' interests and the agreement between the attorneys for the Bishop Estate and the attorneys for the said "lessees," introduction and reception of evidence as between the plaintiff and all three groups of defendants aforesaid was concluded in the trial court on September 3, 1953.

On March 24, 1954, a decision, dated and signed as of the 23rd day of March 1954, was filed by the trial judge. The decision recites, *inter alia,* that is hereinafter quoted.

"* * * All the lands, together with all rights to water arising therein and thereon, were taken by this condemnation for the purpose of construction, development and improvement of the Kaneohe-Kailua water system in the City and County of Honolulu.

"Three parcels of land were considered by this Court on a trial as to value only. Parcel 196, area 4.8 acres, belonging to the Coombs Estate; Parcel 199, area 535 acres, and an easement ten feet in width for a water pipeline over Lot Q-2 [Parcel 200], both belonging to the Bishop Estate. These parcels are located at the head of a hollow valley. Due to geological formation of dikes, heavy rainfall, and porosity of matter between the dikes, the land, i.e., the portion of the valley and the ridges included in the parcels condemned, provides an underground watershed basin, at a relatively high elevation, in close proximity to a center of population."

\* \* \* \* \*

"The sole issue in this case involves one of fixing compensation for the taking. This involves determining under the evidence the value of the property sought to be condemned, as enhanced by its suitability and adaptability as a watershed for the development of water for domestic use. From ascertainment of the answers to these problems, the ultimate decision as to what award shall be allowed to the respective owners for the tak-

ing may then be raised in accordance with law.

"The owners of the lands involved have urged that a consideration of value concerns only the value of water rights and resources. The Government contends that water has no value and that the sole issue is to fix compensation for the taking of the land itself."

\* \* \* \* \*

"In order to arrive at just compensation for property taken by eminent domain proceedings, no exact formula has as yet, been formulated. Reference must be had to the uses to which the property is suitable as determined by the existing business or wants of the community, or such as may reasonably be expected in the immediate future. *Boom Co.* v. *Patterson,* 98 U. S. 403, 25 L. Ed. 206. See, also *Railway Co.* v. *Woodruff,* 49 Ark. 381, 5 S. W. 792, 4 Am. St. Rep. 51; *Currie* v. *Waverly, etc. Co.,* 52 N. J. Law 381, 20 Atl. 56, 19 Am. St. Rep. 452; *Alloway* v. *Nashville,* 88 Tenn. 512, 13 S. W. 123, 8 L. R. A. 123. The mere fact that an owner allows his land presently to lie in idleness does not limit the scope of inquiry as to the uses to which it may be put. The uses to which land may be put must, however, be uses justified by the wants of business or of the community. They cannot be conjectural uses, nor impossible uses. They must be uses to which the land is plainly adaptable, plainly suitable and for which the property would ordinarily sell in the market.

"For what uses are the lands involved plainly adaptable, plainly suitable, and for which they would ordinarily sell in the market? There has been no disagreement between all of the witnesses on the fact that the lands are plainly adaptable, plainly suitable, and would ordinarily sell in the market for watershed purposes and for the development of water for domestic use. Value must then include a consideration of the

value of the land, as enhanced by the value of the water obtainable for domestic use.

"The witnesses for the Government have concluded that the value of the Bishop Estate parcel is $107,000; that the value of the Coombs Estate land is $6,000; and that the value of the right-of-way is $150. They concluded that water, the value of which was admittedly outside the scope of their knowledge, is without value, and must [be], and was therefore disregarded from their consideration.

"The witnesses for the owners and lessees completely disregarded the value of the land as a separate consideration and based their conclusion on the value of the water rights. They concluded that a consideration of the value of the water included, of necessity, a consideration of the value of the land without separation. The Court assumes that this conclusion must have been based on the theory that water must issue out of or flow upon land and does not exist in air as a movable object, subject to a reduction to possession apart from possession of land. The fallacy of this reasoning is apparent throughout their entire calculations. They based their 'value' on a price of water per million gallons per day. They arrived at that price by considering sales of water nearby, on the island of Oahu, and on the island of Maui, ranging from $25 per million gallons to $40 per million gallons. These latter prices were sales made by owners who kept their land and merely sold the water derived from their land. The City and County of Honolulu is not merely condemning the water but also the land which belongs to the owners involved in this suit.

"Thus the Court cannot accept the values set by one group of witnesses and disregard the others. All witnesses were on the right track, but none of them

arrived at the proper destination. Nor does this Court believe that it must add to the value arrived at by the Government's witnesses for the land, the value of the water arrived at by owners' witnesses.

"The testimony of all witnesses legitimately bears upon the market value of the lands, and is a guide to this Court in arriving at the value of the land. If water were considered to be a mineral, the measure of compensation is the sum that would be given for the land with the mineral in it. But the profits, or the price, or the value of the minerals, if the minerals themselves have been taken out, cannot be considered separately as determinative of the market value of the property. *Sanitary Dist.* v. *Loughran,* 160 Ill. 362, 43 N. E. 359; *Searle* v. *Railroad,* 33 Pa. 57; *Port* v. *Railroad Co.,* 168 Pa. 19, 31 At. 950. This land has a special value as water-producing land. The owners, therefore, are entitled to compensation according to its value as such. While the profits, or price, or value of the water, if the water is considered a mineral and itself is taken out, may not control the market value of the property, yet the value and extent and quantity of water if considered a mineral, as it exists upon and within the land, may be considered as a guide in arriving at the value of the land. See: *Seattle & M. R. Co.* v. *Roeder,* 30 Wash. 244, 70 Pac. 498, 97 Am. St. Rep. 864.

"Is water entitled to be considered a 'mineral' within the meaning of the cases cited *supra? 2 Funk & Wagnalls New Practical Standard Dictionary* (1953) defines the word 'mineral' as '(1) a naturally occurring, homogeneous substance or material formed by inorganic process and having a characteristic set of physical properties, a definite range of chemical composition, and a molecular structure usually expressed in crystalline forms. (2) Any inorganic substance, as

ore, a rock, or a fossil.' The same authority defines water as 'a colorless limpid liquid compound of hydrogen and oxygen, $H_2O$, in the proportion of two volumes of hydrogen to one of oxygen, or by weight of approximately 2 parts of hydrogen to 16 of oxygen.' It does not seem reasonable that water should be considered a 'mineral.' By its very definition it cannot be so regarded.

"While not a mineral, and thus not subject to the valuation test of minerals, it is well established in this jurisdiction that water rights have financial value. No case has been brought to the attention of this Court, however, which establishes a formula for determining the financial value of such water rights with any degree of certainty.

"Underground water percolating, oozing or filtrating through the earth is governed and directed by causes so varied and uncontrollable that the quantity of flow from a point certain on the surface of the earth is subject to a practically impossible certainty of measure. In addition, the area through which underground water percolates, oozes, or filters is incapable of exact measurement. Nothing in the testimony establishes that the amount of water used by the owners' witnesses as the so-called dependable flow of water on which to base their calculations of value comes solely from the area of land condemned herein. On the contrary, the evidence establishes that the property lies in a strategic geological position in the dike complex on the island of Oahu, thereby enabling an interception of water which might be moving to the southeastward along the trend of the dike complex from areas of high rainfall toward those of lesser rainfall. The evidence shows that approximately 5 square miles of uplands could reasonably be potentially tributary to the flow of water

to be derived from the property herein condemned. Suppose that interceptions of water occur all along the entire dike complex system from the northwest to the southeast, as well as within the five square miles of uplands above mentioned, what effect would those interceptions have upon the quantity of water which the property owners claim as their base for calculating a market value for the property? For this reason a further deduction is made from the computations offered by the owners' witnesses in arriving at the values set below.

"Clearly, then, the value of the property involved does not lie exclusively within the range of values established by the owners' witnesses. All of the testimony of the witnesses is, and can only be, a possible guide to the Court in arriving at its award.

"It is the opinion of this Court that the value of the lands involved herein is $107,000 for the Bishop Estate parcel, $6,000 for the Coombs Estate parcel, and $1.00 for the right-of-way, enhanced by their special adaptation for water development for domestic use by $107,250 for the Bishop Estate parcel, and $8,715 for the Coombs Estate parcel.

"The total awards are, therefore, $214,250 for the Bishop Estate parcel, $14,715 for the Coombs Estate parcel and $1.00 for the right-of-way."

To this decision, the City and County of Honolulu, which is hereinafter referred to as the "municipal corporation," on April 2, 1954, filed a motion for a new trial. On May 7, 1954, there was filed in the trial court an "ADDENDA TO DECISION DATED MARCH 23, 1954," signed by the trial judge as of the 5th day of May, 1954, which recited, "The right of the plaintiff and purpose and necessity of the eminent domain proceeding herein, as alleged, are hereby, nunc pro tunc, declared to have been

established by the evidence adduced at the hearing." The motion for new trial was denied on June 14, 1954. On June 16, 1954, judgment was entered and filed pursuant to the decision filed as aforesaid on March 24, 1954. An exception to the judgment and second motion for a new trial was filed and denied on August 31, 1954. The municipal corporation has appealed to this Supreme Court from the judgment.

In the opening brief of appellant municipal corporation there is set forth a "SPECIFICATION OF ERRORS," wherein are enumerated the seven alleged errors for which the municipal corporation contends that the judgment of the trial court should be reversed, to wit: (1) "* * * its decision failed to state the reasons therefor, as required by Section 10107, Revised Laws of Hawaii 1945"; (2) "* * * it [the judgment] is based upon capitalization of income, a method which is improper in this case"; (3) "* * * the Trial Court failed to consider the benefit to defendants' remaining land, and therefore made an excessive award"; (4) "* * * the Trial Court erred in refusing to admit evidence as to the cost of water distribution"; (5) "* * * it [the judgment] is based upon a hypothetical *future* valuation, violating the basic legal principle that compensation must be based upon market value on the date of summons"; (6) "* * * the Trial Court valued the land and the water separately"; (7) "* * * the method of computation used by the Trial Court resulted in using 'value to the taker' as the criterion of 'just compensation.' This [latter] was contrary to law and resulted in an excessive award."

We have considered the grounds set forth in the municipal corporation's "SPECIFICATION OF ERRORS" as the basis for the appeal in connection with the entire record presented to us and the several volumes of transcript of proceedings had and evidence presented in the trial

court, together with the briefs filed and oral argument heard herein, and we have come to the conclusions hereinafter expressed.

(1) The reason for the decision of the trial court quite sufficiently appears therein, *supra,* by the analysis the trial court has made of the evidence and the comments of the trial court with respect thereto, such as, *inter alia,* quoted below.

"* * * This land has a special value as water-producing land. The owners, therefore, are entitled to compensation according to its value as such."

\* \* \* \* \*

"While not a mineral, and thus not subject to the valuation test of minerals, it is well established in this jurisdiction that water rights have financial value. No case has been brought to the attention of this Court, however, which establishes a formula for determining the financial value of such water rights with any degree of certainty.

"Underground water percolating, oozing or filtrating through the earth is governed and directed by causes so varied and uncontrollable that the quantity of flow from a point certain on the surface of the earth is subject to a practically impossible certainty of measure. In addition, the area through which underground water percolates, oozes, or filters is incapable of exact measurement. Nothing in the testimony establishes that the amount of water used by the owners' witnesses as the so-called flow of water on which to base their calculations of value comes solely from the area of land condemned herein. On the contrary, the evidence establishes that the property lies in a strategic geological position in the dike complex on the island of Oahu, thereby enabling an interception of water which might

be moving to the southeastward along the trend of the dike complex from areas of high rainfall toward those of lesser rainfall. The evidence shows that approximately 5 square miles of uplands could reasonably be potentially tributary to the flow of water to be derived from the property herein condemned. Suppose that interceptions of water occur all along the entire dike complex system from the northwest to the southeast, as well as within the five square miles of uplands above mentioned, what effect would those interceptions have upon the quantity of water which the property owners claim as their base for calculating a market value for the property? *For this reason a further deduction is made from the computations offered by the owners' witnesses in arriving at the values set below.*" (Emphasis added.)

"Clearly, then, the value of the property involved does not lie exclusively within the range of values established by the owners' witnesses. *All of the testimony of the witnesses is, and can only be, a possible guide to the Court in arriving at its award.*" (Emphasis added.)

The decision in the instant case expressed the determination, opinion and conclusions of the court upon the facts and law pertinent to the issue which was before it, that of the value of the property taken by condemnation. Quite different was the decision of the trial court in *Territory of Hawaii* v. *McGillivray, et als.*, 41 Haw. 191, which merely set forth the court's ultimate conclusions, without any reference to the issues in the case, the court's views thereon or determination thereof and failed to even reveal the factors contributing to the court's expressed conclusions.

(2) Although witnesses for defendants used capitalization of income as one method of arriving at their valu-

ations, neither the decision nor the judgment appear to be based thereon, but rather on the weighing by the trial court of both the evidence for plaintiff and that for the defendants and the variance of values testified to. "The testimony of all witnesses legitimately bears upon the market value of the lands, and is a guide to this Court in arriving at the value of the land." * * * "* * * it is well established in this jurisdiction that water rights have financial value. No case has been brought to the attention of this Court, however, which establishes a formula for determining the financial value of such water rights with any degree of certainty."

* * * * *

"Clearly, then, the value of the property involved does not lie exclusively within the range of values established by the owners' witnesses. All of the testimony of the witnesses is, and can only be, a possible guide to the Court in arriving at its award."

(3) There was no evidence as to any specific benefit conferred upon defendants by the taking of the property condemned, so the trial court did not commit error by failing to mention consideration of benefits. The one witness for appellant could not answer a question as to the difference between a general benefit and a special benefit and, although upon further questioning as to what effect, if any, in the way of benefits to the remaining Bishop Estate land "this water project occasioned," he said that it did and that it gave a special benefit, he explained that by saying: "My experience, and it is my honest opinion, that all lands where pipe lines have been laid benefits have increased on a ratio from one to three, and as high as one to five, and in many cases in excess of that."

Upon cross-examination the same witness said that it was a correct conclusion from his testimony that his "answer would be the same with respect to Kailua, Lanikai,

Waimanalo, if as a result of some improvements made by the County over there in the distribution system water was made available to those areas the market value of those lands would increase too, * * *."

The following question and answer then ensued:

"Q In other words, to boil your testimony down, what you are saying is that if land has no domestic water readily available it is worth X dollars, if domestic water is brought to the land then its market value goes up?

"A That is correct."

It is apparent that the witness was testifying as to a general benefit, rather than a special or direct benefit. A general benefit cannot be considered as an offset to the value of the owner's property in condemnation. Only a special and direct benefit may be offset against value of property taken. See 145 A. L. R. 48.

(4) No error was committed by the trial court in refusing to admit evidence as to the cost of water distribution. Although at the trial the appellant (plaintiff below) offered to prove the cost of installing a distribution system in the Kaneohe district, such evidence was properly excluded, because it would have been irrelevant to the issue of the fair market value of the property condemned and would have had no bearing thereon.

(5) It very clearly appears in the transcript of proceedings had and testimony given in the trial court that each witness who testified, as to the value of the property taken, related his valuation to and fixed it as of the date of the taking, July 19, 1940. Therefore, the judgment of the trial court was not, as alleged by appellant, "based upon a hypothetical *future* valuation," but in conformity with "the basic legal principles that compensation must be made upon market value on the date of summons" to wit, July 19, 1940.

(6) It also appears from the said transcript that each of the two witnesses for the appellant who testified as to the value of the property taken confined his testimony to the value of the land only, without regard for or including the water therewith or therein, and the several witnesses for the defendants in their testimony, respectively emphasized the value of water obtainable from the land, because of being contained therein or naturally flowing onto or within the land; also, because of the land's basin-like formation, elevation, porosity, or geological structure. The property taken was not merely land, but also the water which was incident and appurtenant thereto. In view of the nature of the evidence presented to the trial court, the latter had to consider both the evidence as to the value of the land and that as to the value of the water and thus arrive at a determination of the value of the property as a whole. *Olson* v. *United States,* 292 U. S. 246, at 255, 258; *McCandless* v. *United States,* 298 U. S. 342.

(7) The said transcript does not support the appellant's allegation that "the method of computation used by the Trial Court resulted in using 'value to taker' as the criterion of 'just compensation.'" In this connection we note that although appellant has first, "(1)" *supra,* alleged failure of the trial court to state reasons therefor in the decision, appellant has nevertheless implied that the court based the decision on erroneous reasons!

The Fifth Amendment to the Federal Constitution provides, *inter alia,* that private property shall not "be taken for public use, without just compensation."

In this case, as in any other in eminent domain for appropriation of land for public purposes, regard must be had for the said provision of the Fifth Amendment, and the fact that with the acquisition of land goes whatever is incident and appurtenant thereto, together constituting

the "property" which must not be taken "without just compensation."

Thus in *Boom Company* v. *Patterson,* 98 U. S. 403, 407 (1878), "The point in issue was the compensation to be made to the owner of the land; in other words, the value of the property taken." As to that the court said (pp. 407-408):

"* * * In determining the value of land appropriated for public purposes, the same considerations are to be regarded as in a sale of property between private parties. The inquiry in such cases must be what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted; that is to say, what is it worth from its availability for valuable uses. Property is not to be deemed worthless because the owner allows it to go to waste, or to be regarded as valueless because he is unable to put it to any use. Others may be able to use it, and make it subserve the necessities or conveniences of life. Its capability of being made thus available gives it a market value which can be readily estimated.

"So many and varied are the circumstances to be taken into account in determining the value of property condemned for public purposes, that it is perhaps impossible to formulate a rule to govern its appraisement in all cases. Exceptional circumstances will modify the most carefully guarded rule; but, as a general thing, we should say that the compensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future."

As said in *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, at 324:

216

"* * * in any society the fulness and sufficiency of the securities which surround the individual in the use and enjoyment of his property constitute one of the most certain tests of the character and value of the government."

Also, at pages 325-326 of the same case:

"The language used in the Fifth Amendment in respect to this matter is happily chosen. The entire amendment is a series of negations, denials of right or power in the government, the last, the one in point here, being, 'Nor shall private property be taken for public use without just compensation.' The noun 'compensation,' standing by itself, carries the idea of an equivalent. * * * So that if the adjective 'just' had been omitted, and the provision was simply that property should not be taken without compensation, the natural import of the language would be that the compensation should be the equivalent of the property. And this is made emphatic by the adjective 'just.' There can, in view of the combination of those two words, be no doubt that the compensation must be a full and perfect equivalent for the property taken. And this just compensation, it will be noticed, is for the property, and not to the owner. Every other clause in this Fifth Amendment is personal. 'No person shall be held to answer for a capital, or otherwise infamous crime,' etc. Instead of continuing that form of statement, and saying that no person shall be deprived of his property without just compensation, the personal element is left out, and the 'just compensation' is to be a full equivalent for the property taken. This excludes the taking into account, as an element in the compensation, any supposed benefit that the owner may receive in common with all from the public uses to which his private property is appropriated, and leaves it, to stand as a

declaration, that no private property shall be appropriated to public uses unless a full and exact equivalent for it be returned to the owner.

"We do not in this refer to the case where only a portion of a tract is taken, or express any opinion on the vexed question as to the extent to which the benefits or injuries to the portion not taken may be brought into consideration."

Further (at page 327) :

"* * * It does not rest with the public, taking the property, through Congress or the legislature, its representatives, to say what compensation shall be paid, or even what shall be the rule of compensation. The Constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry."

In accord with *Boom Company* v. *Patterson* and *Monongahela Navigation Co.* v. *United States, supra,* is *Olson* v. *United States,* 292 U. S. 246 (1934). The opinion of the Court, delivered by Mr. Justice Butler, in this latter case includes the statements, pertinent to the rule as to compensation, which are next hereinafter quoted.

"Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held." (p. 255.)

"* * * The fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value. Nor does the fact that it may be or is being acquired by eminent domain negative consideration of availability for use in the public service." (p. 256.) * * * "And, to the extent that probable demand by prospective purchasers or condemnors affects market value, it is to be taken into account."

In *McCandless* v. *United States,* 298 U. S. 342 (1935) — certiorari to the Circuit Court of Appeals for the Ninth Circuit — in the opinion of the court, delivered by Mr. Justice Sutherland, it was said (page 348) :

"* * * In an eminent-domain proceeding, the vital issue — and generally the only issue — is that of just compensation. The proof here offered necessarily related to the value of the land when used for a purpose to which it probably could be put within the rule laid down by the *Olson* case, *supra.* To exclude from the consideration of the jury evidence of this elementary character could not be otherwise than prejudicial."

See, also, *United States* v. *Lambert,* 146 F. (2d) 469 (CCA 2, 1944), opinion of the court by L. Hand, Circuit Judge.

This was an appeal by defendant Lambert of condemnation of certain lands in Suffolk County, New York; the only issue being the amount of the award.

(2-4, p. 471) "* * * The Rules of Civil Procedure [Federal] apply to appeals in condemnation proceedings (Rule 81 (a) (7) and Rule 52 (a) [see Hawaii Rules of Civil Procedure Rule 81 (b) and Rule 52 (a)], so far as it fixes the conclusiveness of findings, is a rule of appellate procedure. Moreover, the valu-

ation of property is an issue particularly for the trial court, for, when all is said, any conclusion can never be more than speculation. Each piece of land is sui generis; there are no others like it, and without others there can be no true market, as there is for fungibles. Sales of similar parcels will certainly help; we can use them as checks or limits up and down, on the theory that a buyer might accept other parcels as substitutes, but they never are equivalents. Hence we think, quite contrary to the defendant's argument, that a judge is wise, in deciding this issue, to be guided by the impression which the experts make upon him. So far as he is not, he will have to put himself in the position of an expert; and while, to some extent that is something which in the end he cannot escape, it is usually safe, so far as possible, to depend upon the apparent frankness, moderation, and sagacity of the witnesses."

\* \* \* \* \*

"So far as we can see, the defendant received all that she proved that she was entitled to; at least we are not convinced that she has proved the award to be 'clearly erroneous.' "

We are of the opinion that, in the instant case, no error was committed by the trial court in determination, under the circumstances, of the values arrived at and fixed by that court. At least, we are not convinced that the municipal corporation has proved the awards made by the judgment entered and filed on June 16, 1954, to be clearly erroneous. Wherefore, we apply the provisions of Rule 52 (a) and shall not set aside the said judgment.

Affirmed.

*Norman K. Chung,* City and County Attorney of Honolulu (*Sidney I. Hashimoto, K. Tim Yee,* Deputies City and County Attorneys with him on the opening brief; *Bertram T. Kanbara,* Legal Assistant to the City and

County Attorney, also with him on the opening and reply briefs), for City and County of Honolulu, appellant.

*J. Garner Anthony* (*Robertson, Castle & Anthony* on the brief) for Trustees Estate of *Bernice P. Bishop,* Deceased, appellees.

*C. Nils Tavares* (*Pratt, Tavares & Cassidy* on the brief) for appellees *Genevra Coombs* and the Executors of the will of *Walter R. Coombs,* deceased.

*John P. Russell* (*Anderson, Wrenn & Jenks*) for Lessees of Bishop Estate; was present, but filed no brief and did not argue.