## UNITED STATES v. WATERHOUSE et al.
### (two cases).
### No. 10104.

Circuit Court of Appeals, Ninth Circuit.

Jan. 6, 1943.

Rehearing Denied March 2, 1943.

Norman M. Littell, Asst. Atty. Gen., John J. Courtney, Sp. Asst. Atty. Gen., and Roger P. Marquis, John F. Cotter, and Wilma C. Martin, Attys., Dept. of Justice, all of Washington, D. C., for appellant.

A. G. M. Robertson, of Honolulu, T. H. (Robertson & Castle, of Honolulu, T. H., of counsel), for appellees.

Before GARRECHT, HANEY and HEALY, Circuit Judges.

HANEY, Circuit Judge.

The United States appeals from two judgments rendered against it in proceed-

ings brought by it to condemn six parcels of land belonging to appellees.

Running westerly from Honolulu is Dillingham Boulevard, also called Pearl Harbor Road. Adjoining that road on the north is a railroad. Adjoining that railroad on the north is Kamehameha Highway which parallels Dillingham Boulevard and the railroad for a way, and then proceeds northwesterly, at about the westerly boundary of the first parcel of land hereafter mentioned.

The first parcel of land, known as lot C-3-B-2-A, lies south of Dillingham Boulevard and the railroad and is nearly rectangular. Lot C-3-B-1 adjoins the first parcel on the west and is rectangular. Lot C-3-A adjoins the second parcel on the west and is also rectangular. Lot C-2 adjoins the third parcel on the west and is nearly rectangular. The south sides of these four parcels and the west side of the fourth parcel (Lot C-2) adjoins Hickam Field, an air base of the United States Army. In the fourth parcel (Lot CO2) and at the northwest corner thereof is a small parcel, nearly rectangular shape, the east and south sides of which adjoin Lot C-2, the west side of which adjoins Hickam Field, and the north side of which adjoins Dillingham Boulevard.

North of Dillingham Boulevard and the railroad is a triangular parcel known as Lot D or the gore Lot. The westerly boundary thereof is a continuance of the western boundary line of Lots C-2 and C-1 and intersects Kamehameha Highway at its northern point. The boundary line then turns to the southeast and follows the western side of Kamehameha Highway to a point where the latter runs parrallel with Dillingham Boulevard and the railroad. From that point the boundary line runs west along the railroad to the western boundary line. One side of the triangle, which we may call the base, is thus immediately north of Lots C-3-B-2-A, C-3-B-1, C-3-A, and C-2, and is separated from them by Dillingham Boulevard and the railroad. The northeast side of the triangle is Kamehameha Highway, and the northwest side of the triangle adjoins Pearl Harbor Navy Yard, a United States Naval Base.

The acreage of the parcels is as follows: 118.920 acres in C-3-B-2-A; 24.036 acres in C-3-B-1; 50 acres in C-3-A; 75.039 acres in C-2; 2.249 acres in C-1; and 61.512 acres in D (gore lot). The total acreage is 331.756. Case No. 434 was filed on November 20, 1940, and covered the 77.288 acres contained in lots C-1 and C-2. Case No. 436 was filed on November 27, 1940, and covered all other lots mentioned having a total acreage of 254.468 acres. In the testimony, lot D (gore lot) was considered as one tract, lots C-1 and C-2 were considered another tract, and lots C-3-A, C-3-B-1, and C-3-B-2-A were considered as another tract. With the exception of Lot C-1, all the land was used for growing sugar cane. Lot C-1 was used as a parking lot for vehicles. All the lands were leased on July 27, 1927, as part of a tract of 1,451.66 acres for a term of 15 years commencing on January 1, 1929, at a rental of $23.50 per acre.

The lands are within the limits of the City and County of Honolulu, about 9 miles west of the civic center of the city, and are referred to as lands belonging to the Damon Estate. About a mile and three-quarters closer to the city (east of the lands involved here), and north of, but adjoining, Kamehameha Highway, the Damon Estate, in 1924, subdivided 9.5538 acres into 14 lots and leased them all within 6 months. At the time of trial, the net rental from them was $133.20 per acre. About a mile and a quarter east of the lands involved here, and south of Kamehameha Highway, the Damon Estate in 1929 subdivided 121.532 acres into about 100 lots, and leased 90% of them in two or three years. The net rentals from them was $42.26 per acre. About half a mile east of the lands involved here, and south of Kamehameha Highway, the Damon Estate in 1933 subdivided 178.695 acres into about 300 lots and leased 90% of them in a little over three years. The net rentals from them was $63.88. Adjoining this last-mentioned subdivision, on the west thereof, the Damon Estate in 1938 leased 9 acres to one Waterhouse, who subdivided the acreage. The rental therefor was $80 per acre.

Appellant's witnesses Crozier and Fernandes collaborated and reached identical valuations. With respect to Lot D, they opined that a strip of land 200 feet wide along the northeast side of the triangle, and fronting on Kamehameha Highway, had more value than the remainder. They valued Lot D at $25,283. With respect to Lots C-1 and CO2, they opined that a strip of land 250 feet wide along, and fronting on, Dillingham Boulevard, had more value than the remainder. They

valued Lots C-1 and C-2 at $33,498. With respect to Lots C-3-A, C-3-B-1 and C-3-B-2-A, they opined that a strip of land 200 feet wide along, and fronting on, Dillingham Boulevard, had more value than the remainder. They valued such lots at $78,706. With respect to all the lands except the frontages, they testified that the highest, best and most profitable use to which such lands were adapted was for growing sugar cane. With respect to the frontages, Crozier testified that the frontages, because of their proximity to the roads, were more valuable because of their potential uses, but did not state what such uses were. Fernandes testified that a willing buyer would consider that the frontages had a higher and better value for possible future uses other than cane land, such as house and farm lots. Both witnesses placed a direct value per acre on all lands, distributed as above set forth.

All valuation witnesses for appellees testified that the lands had outgrown the category of cane lands, and that the highest, best and most profitable use for which the lands were adapted in November, 1940, was residence, business and truck gardening. There was considerable evidence of a growing demand for such properties, and the reason therefor. There was also evidence that the Damon Estate had had a plan of subdivision for some time. The values given by each witness were "market values".

Castro, for appellees, valued Lot D at $79,311.75 by considering its best use as a subdivision. He arrived at that value by capitalizing, at 4%, the average rentals of $51.57 per acre which he said could be obtained by leasing the lots in the subdivision. He valued Lots C-1 and C-2 at $79,715.43 by considering its best use as a subdivision. He arrived at that value by capitalizing, at 4%, the average rentals of $41.25 per acre which he said could be obtained by leasing the lots in the subdivision. He valued the remaining lots at $227,572.-50, by considering their best use as a subdivision. He arrived at that value by capitalizing, at 4%, the average rentals of $47.176 which he said could be obtained by leasing the lots in the subdivision.

Harrison, for appellees, valued Lot D at $63,449.43 by considering its best use as a subdivision. He arrived at that value by valuing a portion of it directly as residential properties, and by capitalizing, at 5%, the average rentals which he said could be obtained from the lots in the subdivision which would be used as small farms. He used the same method in valuing the other lots. His valuation of Lots C-1 and C-2 was $63,772.35 and his valuation of the other lots was $182,058.

Kearns, for appellee, testified substantially the same as Harrison's testimony.

Appellee Russell, one of the trustees of the Damon Estate, valued the lands as an owner. He also valued the lands by considering their best use as a subdivision, and by capitalizing, at 4%, the earnings which he said would be made therefrom. His valuations were $127,931.25 for Lot D, $170,279.17 for Lots C-1 and CO2 and $216,134.75 for the remaining lots.

The Damon Estate holds other lands in the vicinity of the lands in question. On cross-examination appellees' valuation witnesses were asked whether the opening of some of these lands as subdivisions in competition with the lands in question considered as subdivisions would affect the value of the lands in question. Castro testified that the value of the lands in question would not be affected by the competition of such subdivisions. Harrison testified that he had valued the lands knowing that the trustees had stated that they would not subdivide other lands. Kearns testified that the value of the lands in question would not be affected by subdivision of other lands "because the land on the mauka side, as far as I know, would not at any time be offered for sale" and that the assumption that such a subdivision might be made "appears to me to be somewhat preposterous, because I know the owners of this land and have known them a long time and know the methods they adopt with their property". Russell testified that his valuations were based on the assumption that there would be no competition from subdivisions of other lands owned by the Damon Estate, which competition, he knew, would not exist.

In addition to the foregoing, Castro testified that subdivision of the lands in question "would require special negotiation and systematic and intelligent financing in order to develop the area as a whole into a community section which in a reasonable period of time would be absorbed by the people in the market and made a valuable and important part of the City of Honolulu" and that was one of

the things a willing buyer would have had in mind in November, 1940.

In summary, the valuations given by the various witnesses and the verdicts, are as follows:

include any enhancement in the value of the lands taken arising from the prospect that they could profitably be subdivided".

After careful scrutiny of the record, we believe the testimony for appellees was

| | Lots | Other Lands | | |
| Source | C-1 and C-2 | Lot D | Other-Lots | Total |
| --- | --- | --- | --- | --- |
| Appellant | $ 33,498.00 | $ 25,263.00 | $ 78,706.00 | $137,487.00 |
| Harrison & Kearns | 63,772.35 | 63,449.43 | 182,058.00 | 309,279.78 |
| Castro | 79,715.43 | 79,311.75 | 227,572.50 | 386,599.68 |
| Russell | 170,279.17 | 127,931.25 | 216,134.75 | 514,345.17 |
| Verdicts | 61,830.40 | 203,574.40 | | 265,404.80 |

The instructions of the court below followed closely the law stated in Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236. In addition, the court gave the following instruction: "In this case it is admitted without dispute in the testimony that the lands condemned are a part of a holding in the immediate vicinity, owned by the same respondents. In deciding this case, you are not to assume any particular type or policy or management on the part of the trustees with respect to the remainder of said lands. The very theory and hypothesis upon which this case is being tried is the assumption of a free and open market, of a willing purchaser and a willing buyer [seller] in a free transaction. In considering this case, therefore, you are not bound to assume that the Trustees of the Damon Estate would not release any of the lands in the immediate vicinity from their present status."

Appellant contends that the court should have instructed the jury to return verdicts in the amounts the government witnesses testified to, because the evidence of appellees' witnesses was inadmissible and should have been excluded. It is argued that appellees' witnesses capitalized the rental value of the lands on the basis of rentals which would be received from the property as subdivided; that "the prospect that agricultural land may be profitably subdivided for dwelling, business and truck-garden sites, does not make it as valuable as an existing subdivision"; that the "jury may not consider estimates of the prices for which the land would sell if sub-divided"; and that "estimates as to the rents which could be derived from the land if it were improved" are not admissible. At the same time appellant says in its brief: "In other words, just compensation should

different from the description of it made by appellant. Appellees' valuation witnesses testified as to the market value of the land in November, 1940. In giving the reasons for the respective values, the witnesses said in effect that a willing buyer would not consider the lands as cane-lands only; that such a buyer would recognize that, in view of the demand for home-sites, business-sites and small farms and in view of the adaptability of the land for such purposes, he could pay more for the lands because the income therefrom, when used for the purposes mentioned, would be greater; and that in determining what a willing buyer would pay for the land, such buyer would estimate the net income from the land when used as he would use it, and arrive at a value by capitalizing such income from which he would deduct his required profit, and thus arriving at an amount which he, as a willing buyer, would be willing to pay for the land.

■ Of course, in that chain of reasoning there are several variables, such as: (1) would a willing buyer consider the lands as anything but cane-lands? (2) if so, could he afford to pay more, i. e., would the income be greater when used for other purposes; (3) would he determine the value by capitalizing the net income? (4) if so, what should the estimated income be? and (5) at what rate of interest should the income be capitalized? Because of these variables, it is easily seen why values arrived at by that method could not be conclusive. Yet, capitalization of rental value is evidence of the market value of the land. North American Telegraph Co. v. Northern Pac. Ry. Co., 8 Cir., 254 F. 417, certiorari denied 249 U.S. 607, 39 S. Ct. 290, 63 L.Ed. 799; United States v. Shingle, 9 Cir., 91 F.2d 85, 89, certiorari

denied 302 U.S. 746, 58 S.Ct. 264, 82 L. Ed. 577.

Appellant's argument is based on the assumption that appellees' witnesses were testifying as to what prices the land would sell for if subdivided, and as to rents which could be derived from the land if it were improved. The effect of that argument is that such witnesses were testifying not as to present value but as to some future value. The record gives no support to that argument, but, in fact, shows that the witnesses were testifying as to the value of the land in November, 1940.

■ The question remains as to whether the court below erred in permitting evidence of value as given by witnesses for appellees. The applicable rule is stated in Olson v. United States, supra, 292 U.S. 255, 257, 54 S.Ct. 708, 78 L.Ed. 1236, as follows:

"Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held. * * *

"In respect of each item of property that value may be deemed to be the sum which, considering all the circumstances, could have been obtained for it; that is, the amount that in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy. In making that estimate there should be taken into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining. * * * The determination is to be made in the light of all facts affecting the market value that are shown by the evidence taken in connection with those of such general notoriety as not to require proof. Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth. * * *"

■ As applied here, the evidence was admissible if the use of the land as testified to was a "use for which the property is adaptable and needed or likely to be needed in the reasonably near future". The evidence was inadmissible if such use did "depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable". The determination of that question "is to be made in the light of all facts affecting the market value that are shown by the evidence taken in connection with those of general notoriety as not to require proof".

■ Reduced to simple terms, this means, we think, that if there is any substantial evidence to show that the adaptability of the lands in question for the uses testified to was "reasonably probable", then the evidence was admissible, and it was for the jury to say whether such adaptability affected the market value of the lands. On that question we think the decision of the court below was correct. To begin with all valuation witnesses were agreed that the frontages were adaptable for purposes other than cane-land. Even appellant's witnesses recognized that fact. The dispute existed only as to the remainder of the lands.

■ For appellees, there was testimony of a demand for the uses mentioned and of the reasons therefor. There was also evidence of the record of previous subdivisions in that vicinity. Under these circumstances, we think the question was properly submitted to the jury.

Affirmed.