CITY AND COUNTY OF HONOLULU, a municipal corporation, Plaintiff-Appellant, Cross Appellee, *v.* MARKET PLACE, LIMITED, a Hawaii corporation, Defendant-Appellee, Cross Appellant, BANK OF HAWAII, JIRO-ICHI OTANI, Defendants, and DHS CORPORATION, a Hawaii Corporation, Defendant-Appellee.

NO. 5378

DECEMBER 14, 1973

MARUMOTO, ACTING C.J., ABE, LEVINSON and KOBAYASHI, JJ., and CIRCUIT JUDGE HAWKINS in place of RICHARDSON, C.J., disqualified.

OPINION OF THE COURT BY LEVINSON, J.

This is an eminent domain proceeding arising out of a taking by the City and County of Honolulu of a parcel of ocean-front land at the foot of Diamond Head, for the purpose of extending Kapiolani Park. The land comprises 55,894 square feet in area and is improved by an expensive, two-story residential home. On the date of summons, August 25, 1969, it was owned by the defendant-appellee, cross-appellant Market Place, Limited, hereinafter referred to as MPL, which had leased it to the defendant-appellee DHS Corporation, hereinafter referred to as DHS, under a "Developer's Lease" dated August 1, 1968.

By the terms of that instrument, DHS undertook to develop the subject property into an 11-unit, luxury low-rise condominium project. The lease was for a 75-year term, and specified a nominal rental until the initiation of construction, an annual rental of $15,300.00 during construction, and an annual rental of $100,600.00 for the 15-year period following the date of first occupancy. There was also a premium of $126,000.00 payable by DHS to MPL upon completion of the project. The lease was terminable upon, among other things, the failure of DHS to sell eight of 11 units by March 1, 1969 or to obtain a building permit for the project. It also contained a "condemnation clause," in which the parties agreed that DHS' leasehold would automatically terminate in the event the property was acquired by a public authority through eminent domain, and that compensation attributable to such acquisition would be payable exclusively to MPL.[1]

By March, 1969, DHS had sold no condominium units and

---

[1] The relevant portions of the lease are contained in paragraph 26, and provide as follows:

In case at any time or times during the term hereof all of the demised premises included in the project or any part thereof shall be taken or condemned in fee simple by any authority having the power of eminent domain, then and in every such case the estate and interest of Lessee in the demised land so taken or condemned shall at once cease and determine upon acquisition by such authority of title thereto or right to possession thereof, and Lessee shall, whenever requested by Lessor, deliver up to Lessor peaceably possession of the land so condemned together with any buildings or portion of buildings thereon as may be taken by condemnation, and Lessee shall not by reason of such taking or condemnation be entitled to any claim against Lessor for compensation or indemnity for his leasehold interest, and all compensation and damages for or on account of any land shall be payable to and be the sole property of Lessor and all compensation and damages for or on account of any buildings or improvements on the demised land shall be payable to a condemnation trustee as provided in the By-Laws who shall disburse the same to the Lessee-Owners entitled thereto in accordance with the provisions of the By-Laws; . . . .

The Lessee shall have the right to claim and recover from the condemning authority, but not from the Lessor, such compensation as may be separately awarded or recoverable by the Lessee in its own right on account of any and all damages to it during such period as the premises are rendered unfit for occupancy by reason of any condemnation and/or for or on account of any cost or loss to which the Lessee might be put in altering said building or improvement as a result of such condemnation, or in removing its furniture, fixtures and equipment, so long as such action or the payment of such damages shall not affect or diminish the compensation payable to the Lessor upon condemnation as provided for herein.

the City was withholding a building permit for the project. Nonetheless, MPL did not exercise its power to terminate the lease. Indeed, on June 16, 1969, DHS filed suit in the first circuit court to compel the City to issue a building permit, and in due course, the court issued a writ of mandamus to this effect. By that time, DHS had expended $86,373.61 in initial development costs for the proposed project, including expenses for feasibility studies, preliminary and final architectural plans and drawings, promotional literature, local and national advertising, and legal costs and fees.

On August 5, 1969, the City Council adopted an ordinance which amended the General Plan for the City and County of Honolulu for the Diamond Head area, changing the use thereof from hotel-apartment and residential to park. By this measure the City and County was committed to making an extension of Kapiolani Park in the direction of Diamond Head, and pursuant thereto it filed this suit to condemn the subject property twenty days after the passage of the ordinance. Nearly one year later, on May 28, 1970, the City and County deposited with the clerk of the first circuit court $961,500.00 as estimated just compensation for the property pursuant to HRS § 101-29. On June 5, 1970, the City and County filed a Motion for Order Putting Plaintiff in Possession, and on the same date the trial court issued an order to this effect, to become effective ten days after service of the order on the parties. Although the condemnees were served on June 10, 1970, they did not withdraw this money until June 15, 1970, on which date it was agreed by the condemnees that DHS could satisfy the full measure of its claim for just compensation, $86,373.61, from the deposit thus withdrawn. At trial the only issue was the amount of just compensation due the condemnees, and on April 14, 1972 the jury returned a verdict in favor of DHS in the amount of $86,373.61 and in favor of MPL in the amount of $950,198.00. The former figure was a verdict directed by the trial court and the latter figure represented the jury's estimation of the fair market value of the subject property on August 25, 1969, the date of summons.

Prior to the entry of judgment on the foregoing awards, on

May 19, 1972, the City and County deposited $75,071.61 with the circuit court as an additional estimate of just compensation. Because certain conditions were attached to this deposit, however, this sum was not withdrawn by the condemnees until June 2, 1972. On July 14, 1972, the trial court entered a judgment in the case which incorporated the jury's verdict and which, in addition, awarded interest at various rates as blight of summons damages on the $86,373.61 amount payable to DHS and the $950,198.00 amount payable to MPL.

From this judgment MPL and the City and County appealed, raising numerous points with respect to the conduct of the trial, the correctness of jury's awards of just compensation and the trial court's adjudication of interest thereon.

## I. THE APPEAL OF THE CITY AND COUNTY

### A. *The Award of $86,373.61 to DHS*

The trial court directed the jury to return a verdict in the amount of $86,373.61 as "damages" to DHS for expenditures it made in developing the property for condominium use pursuant to the "Developer's Lease." This award was not intended to represent any component of the fair market value of the property to which DHS was entitled, but rather constituted compensation to DHS for its out-of-pocket expenditures for development that were rendered worthless by the condemnation. The trial court apparently considered itself bound to direct the jury to make this award by article I, section 18 of the Hawaii Constitution, which provides that "[p]rivate property shall not be taken *or damaged* for public use without just compensation" (emphasis added). It was not until a constitutional amendment in 1968 that the words "or damaged" were included in this provision.

One purpose of adding these words to the Constitution was to conform it to the constitutions of 25 other states with respect to the range of property interests compensable in the exercise of the power of eminent domain. *See* Mattoch, *The Amended Just Compensation Provision of Hawaii Constitution: A New Basis for Indemnification of the Condemnee*, 6

HAWAII BAR J. 55 (1969). Prior to the amendment, only the owner of physically "taken" property was entitled to compensation in Hawaii, and those whose property was merely consequentially "damaged" by the primary taking were without recourse. *See, e.g., Widemann v. Thurston,* 7 Haw. 470 (1888). The chief purpose in adding the "or damaged" clause to the Constitution was to remedy this situation. Accordingly, courts would continue to compensate individuals for condemnatory "takings" of their property under traditional measures thereof, but would *add* to the class of those entitled to indemnification individuals whose property, although not technically "taken," is nonetheless injured by a government use elsewhere in a way that society as a whole, and not the individual property owner, ought to bear the costs.[2] Mattoch, *supra* at 56; *see* 1 L. ORGEL, VALUATION

---

[2] As stated in Committee of the Whole Report No. 15, 1 PROCEEDINGS OF THE CONSTITUTIONAL CONVENTION OF HAWAII OF 1968, at 357 (1973) (emphasis added):

Recommendation: Your Committee recommends that Section 18 as proposed be adopted. The amendment proposed by Committee Proposal No. 11 extends the protection that "private property shall not be taken for public use without just compensation" to cover also private property damaged for public use. *The purpose of the amendment is to provide relief to a property owner where his property has been damaged without any physical taking, as a result of an undertaking for a public use.* In addition to the State and its political subdivisions the amendment also applies to a public utility or any other agency or corporation duly authorized by the legislature to exercise the power of eminent domain.

Existing Section 18 of the State Constitution requires compensation only in the case where private property is physically taken for a public use. The courts have generally construed this to exclude compensation where a property has been damaged but not physically taken for a public use. *The amendment is intended to apply to certain of those damages resulting from an undertaking for a public use and not those types of damages normally recoverable in tort actions.* The amendment is neither intended to affect governmental bodies in their lawful and proper exercise of police powers to protect public health, safety and welfare, nor apply to instances of zoning or planning, which fall within the proper exercise of such police powers.

Your Committee has considered the case of *Rigney v. City of Chicago,* 102 Ill. 64 (1881). Illinois was the first state to adopt such an amendment in its constitution and was followed by twenty-four other states. The *Rigney* case was the first to interpret such an amendment, and since that case a considerable body of law has been developed by the Illinois court and the courts of other states construing similar constitutional provisions.

Your Committee's reference to and consideration of the law developed in other jurisdictions was to satisfy your Committee that the phrase "damaged for public use" within the instant context is not so vague and indefinite as to escape practicable applicability. The established body of law will be helpful and will

UNDER THE LAW OF EMINENT DOMAIN § 6 (2d ed. 1953) [hereinafter cited as ORGEL]; 2A J. SACKMAN, NICHOLS' THE LAW OF EMINENT DOMAIN § 6.4432 (Rev. 3d ed. 1970) [hereinafter cited as NICHOLS].

In this case, the City and County condemned all interests in the subject property, including those of MPL and DHS. As a consequence, it was constitutionally obligated to pay whatever fair market value the subject property had on August 25, 1969, with that amount to be allocated among the various interests entitled thereto. *See City of Durham v. Eastern Realty Co.*, 270 N.C. 631, 155 S.E.2d 231 (1967). As part of the process of determining fair market value, this court has held that evidence of sums expended in the development of property to a use more valuable than that to which it was actually put at the time of taking is admissible to show enhancement of its value. *Compare State v. Chang*, 50 Haw. 195, 436 P.2d 3 (1967) *with Hawaii Housing Authority v. Rodrigues*, 43 Haw. 195 (1959). Such expenditures are not, however, recoverable in and of themselves.

As we stated in *City & County v. Bonded Investment Co.*, 54 Haw. 385, 389, 507 P.2d 1084, 1088 (1973):

---

provide guidance to our courts; however, it is not your Committee's intent that our courts be bound by each precedent in every case. It should also be noted that *it is not the intent of your Committee that our courts be guided or controlled in any way by the several specific examples mentioned on page 8 of Standing Committee Report No. 55* and in the debates of your Committee of the Whole.
It is true that in Standing Committee Report No. 55, 1 PROCEEDINGS OF THE CONSTITUTIONAL CONVENTION OF HAWAII OF 1968, at 235 (1973), the following example was given of "uncompensated damages to private property under our present Constitution which would be compensable under your Committee's proposal":
    There is no compensation for plans and drawings that are made for the future use of any property. Architectural designs, drillings, etc. are often made, only to have the owner find that they are worthless after his property has been condemned.
However, the Committee of the Whole Report quoted above indicates that this and the other examples given by the Standing Committee were not to influence subsequent court interpretations of the amendment "in any way." We note, moreover, that the example quoted above is a misstatement of the law in any event, since State v. Chang, 50 Haw. 195, 436 P.2d 3 (1967), held more than eight months prior to the date of the Standing Committee Report, September 5, 1968, that such expenditures *are* indirectly recoverable since they are considered as evidence in the process of determining the fair market value of the taken property.

In *Hawaii Housing Authority v. Rodrigues*, 43 Haw. 195 (1959), this court held that it was error to allow expenses incurred by the landowner in connection with a proposed residential subdivision of land and anticipated profit in the event the subdivision was completed, as part of just compensation. Later, in *State v. Chang*, 50 Haw. 195, 436 P.2d 3 (1967), this court discussed *Rodrigues*, stating that the expenses incurred and anticipated profits were too uncertain and conjectural to be considered. *Rodrigues* was then modified when we held that expenditures made toward the development of the land were admissible to show enhancement of the value of land in determining fair market value. We did not hold, as condemnees allege, that such expenses were per se recoverable as part of just compensation.

*Rodrigues, Chang* and *Bonded Investment* all involved situations in which the condemned properties were being developed by their owners at the time of the taking. Nonetheless, the same principle applies to cases such as this in which the property is being developed by a lessee, since as a general rule the proper method of determining just compensation for property subject to several, independently held interests is to value it as an unencumbered freehold estate, with allocation of fair market value thus determined to be made thereafter among the various interests. *See* 4 NICHOLS § 12.36[1]. This basic, "undivided fee" rule of valuation is unaffected by the enactment of a "taken or damaged" measure of compensability in eminent domain proceedings. *See Lambert v. Giffin*, 257 Ill. 152, 100 N.E. 496 (1912) (Illinois being the first state to change its constitution to read "taken or damaged" as the measure of compensability, in 1870).[3]

DHS complains that the "condemnation clause" in the lease, quoted at note 1 *supra*, may operate to terminate its leasehold interest in the subject land and the right to compensation therefor resulting from the taking by the City and County. From this, DHS would have us reason that the con-

---

[3] It should be noted that Illinois precedent in this area was referred to approvingly in the Committee of the Whole Report, quoted at note 2 *supra*, on the proposed amendment to article I, section 18 of the Hawaii Constitution.

stitutional right to compensation for property "damaged" by a public use includes indemnification for development costs incurred by a lessee subject to such a clause. The alternative to such a holding, DHS argues, would be to enrich unjustly the lessor to the extent that the lessee's development expenditures enhanced the fair market value of the taken property, and to leave the lessee remedyless in recovering these out-of-pocket losses.

We fail to perceive the injustice of such a result, however. Where a landlord and tenant have contractually agreed as to the disposition of compensation in the event of condemnation, such an agreement is generally held binding. *Territory v. Arneson*, 44 Haw. 343, 354 P.2d 981 (1960). This rule acknowledges that the allocation of risks in such circumstances is a matter as to which the parties are free to bargain. If DHS is entitled to no part of the award of the fair market value of the subject property by virtue of the condemnation clause in the lease, such a result can only be viewed as a consequence of its choice to assent to the clause in the first instance. Certainly DHS cannot rely on article I, section 18 of the Hawaii Constitution in establishing an independent right to compensation for expenditures which, under prior decisions of this court, are part of the process of determining the fair market value of the taken property in any event. *See, e.g., City & County v. Bonded Investment Co., supra* at 389, 507 P.2d at 1088.

We hold that it was error for the trial court to direct a verdict in the amount of $86,373.61 as compensation for "damages" to DHS for expenditures it made in developing the subject property. These expenditures are, at best, admissible as evidence of the land's enhanced value in the sense that the anticipated condominium project may have been brought closer to fruition thereby. *Id.; cf. Kimball Laundry Co. v. United States*, 338 U.S. 1, 18 (1949). They are not, however, per se recoverable by DHS, and any compensation to which DHS is entitled must come from an allocation of the fair market value of the land to its leasehold interest, if any, at the time of the taking. Since the trial court excluded evidence of these development costs on the issue of the fair market

value of the taken land, the jury in awarding $950,198.00 with respect thereto was not fully informed of all evidence of value. It follows that there must be a new trial to assess properly the amount of just compensation.

## B. *The Interest Rate Applicable in Determining Blight of Summons Damages*

As part of the just compensation awarded by the judgment in this case, the trial court ordered the City and County to pay interest as "blight of summons damages" — a term which in general means the indemnification due a condemnee for the damages resulting from the government's delay in paying the full cash equivalent of the property taken on the date of summons. There are two basic varieties of blight of summons damages in Hawaii. One arises during the period between the date of order of possession under HRS §§ 101-28 or 29 and the date of final payment of just compensation to the defendant, and consists of interest at the statutory rate of 5% per annum provided in HRS §§ 101-33 and 25 applied during this period to the amount by which the final award of just compensation exceeds the deposit of estimated just compensation upon which the order of possession was based.[4] The other arises during the period between the date of summons and the date of order of possession, and, under *City & County v. Bonded Investment Co., supra*, consists of interest also at a rate of 5% per annum applied during this period to the final award of just compensation.

The trial court in the present case determined the date of

---

[4] HRS § 101-33 provides:

If an order is made letting the plaintiff into possession as provided for in sections 101-28, 101-29, and 101-32, the final judgment shall include, as part of the just compensation and damages awarded, interest at the rate provided in section 101-25 [5%] from the date of the order until paid by the plaintiff; provided, that except in the case of an appeal by the plaintiff as provided in section 101-32, interest shall not be allowed upon any sum paid by the plaintiff to the clerk of the court from the date of the payment. The court may fix and include in the order or judgment the time within which and the terms upon which the parties in possession shall be required to surrender possession to the plaintiff. The court may make such orders in respect of encumbrances, liens, rentals, taxes, assessments, insurance, and other charges, if any, as shall be just and equitable.

order of possession to be June 15, 1970 — ten days after the order was filed. However, under HRS § 101-29 an order of possession becomes "effective" ten days after *service* thereof on the condemnees. Since DHS and MPL were not served with the order of possession until June 10, 1970, by the terms of section 101-29 the order's effective date was June 20, not June 15, 1970. While the trial court thus erred in finding that the latter date was the date of order of possession, the error was not pivotal. In *City & County v. Bonded Investment Co.*, *supra* at 397, 507 P.2d at 1092, we held "that the interest rate of 5% is the proper or reasonable rate to be uniformly applied in computing blight of summons damages." This holding effectively eliminated the significance of the date of order of possession in determining blight of summons damages, the interest rate applicable to which prior to *Bonded Investment* turned on whether these damages arose before or after the date of order of possession under *State v. Coney*, 45 Haw. 650, 372 P.2d 348 (1962).

*Bonded Investment* was decided after the date of judgment in this case, and hence the trial court followed *Coney* in awarding the normal commercial rate of interest (which it found to be 9%, 9½%, 10% and 10½%) for the period arising before June 15, 1970. Since *Bonded Investment* overruled *Coney* in this respect, on remand of this case the trial court must revise its interest award to conform to the 5% rate which the former decision held definitive in computing *all* blight of summons damages. Of course, the application of this rate must necessarily await the new determination of fair market value required by other portions of this opinion.

### C. *The Assessment of Interest on Sums Deposited by the City and County with the Clerk of Court*

On May 28, 1970, the City and County deposited $961,500.00 with the trial court as an estimate of just compensation due the condemnees. In an affidavit supporting the condemnor's motion for an order to put it in possession, it was recited that this "sum has been paid by the plaintiff to the Chief Clerk of the above entitled Court for the benefit of the

parties entitled thereto.'' The trial court in its Order Putting Plaintiff Into Possession dated June 5, 1970, and effective June 20, 1970 (ten days after service on the parties), approved the deposit and stated that it "shall be held by the Chief Clerk of this Court pending the further order or orders of the Court with reference thereto.'' The condemnees failed to request withdrawal of the deposit until June 15, 1970 — five days after they were notified of the order of possession — on which date the trial court promptly approved and ordered withdrawal of the money.

In its judgment, the trial court continued the running of interest on the amount of the first estimate of just compensation during the time lag of eighteen days between the deposit of the estimate and withdrawal thereof by the condemnees. This was error. HRS § 101-30 provides that "[n]o order of possession shall issue unless the plaintiff has paid to the clerk of the court issuing the order, *for the use of the persons entitled thereto,* the amount of the estimated compensation or damages.'' (Emphasis added). Since the purpose of blight of summons damages is to compensate a condemnee for the loss of use of the cash equivalent of the taken property, HRS § 101-33 specifies that "interest shall not be allowed upon any sum paid by the plaintiff to the clerk of the court *from the date of the payment.*'' (Emphasis added).

Reading these two provisions in conjunction, it appears that there is no obligation on the part of the condemnor to pay interest to the extent that it makes an unconditional deposit of estimated just compensation with the clerk of the court. The City and County made such a deposit on May 28, 1970, and that is the date on which the trial court should have stopped the running of interest on the deposited sum as non-statutory blight of summons damages. While the deposit was held by the court pending its "further order or orders,'' this was standard practice in the course of which the condemnees at any time could have moved for the withdrawal of the deposited sum under HRS § 101-31.[5] There was, of course, a hiatus

---

[5] HRS § 101-31 provides in pertinent part:

Upon the application of the parties entitled thereto the court may order that the amount of the estimated compensation or damages stated in the motion and paid

of 13 days between the date of deposit and the date that the order of possession was served on the condemnees, during which the condemnees may not have been aware of the existence of the deposit. However, this appears to be a necessary consequence of the legislative choice to stop the running of interest on the date of the *payment* of a deposit to the clerk of court rather than on the date of service of the order of possession. Certainly this gap was not the fault of the City and County, which made an unconditional deposit on May 28, 1970. In view of the clear statutory mandate of HRS § 101-33 against the running of interest beyond this date, the City and County should not have been penalized by an interest charge for the failure of the condemnees to demand promptly their right to the deposited estimate. *See Wilmington Housing Authority v. Nos. 401, 403, 405 East Seventh Street,* 56 Del. 595, 195 A.2d 392 (1963).

Different problems arise, however, with respect to the second deposited estimate. On May 19, 1972, a month after the jury verdict but prior to the entry of judgment, the City and County deposited $75,071.61 as an additional estimate of just compensation. Its purpose in doing so was to conform its total deposit with the final jury award, thereby discharging any future interest liability under HRS § 101-33. However, unlike the first deposit, this second deposit was accompanied by a motion to approve the same with the following restriction on distribution:

> Plaintiff hereby consents to a court order of distribution of the additional deposit, provided that such order contain such protective measures to insure the return of any monies not lawfully due the distributees together with such additional interest, damages or charges for wrongful withdrawal of funds to which distributees may not be entitled.

It was not until June 2, 1972 that the trial court released the additional deposit to the condemnees, with interest computed at the rate of 5% to that date. The record shows that this

---

to the clerk of the court, or any part thereof, be paid forthwith for or on account of the just compensation to be awarded in the proceedings.

delay was a direct result of the condition noted above and the opposition to immediate withdrawal voiced by counsel for the City and County at the hearing on his motion to approve the deposit.

As already indicated, an initial deposit of estimated just compensation entitling the condemnor to an order of possession must be "for the use of the persons entitled thereto" under HRS § 101-30. As this language suggests, only if such a payment is truly unconditional will it stop the running of interest as blight of summons damages on the amount of the deposit. As stated in 3 NICHOLS § 8.713[2], at 229 [citation omitted]:

> When the constitution [or statute] requires that the money be paid to the owner or into court for his use, the owner must have the right to withdraw and use the money at once, if he will accept it. The requirement is not met by a conditional deposit or by a deposit for the use of the supposed owners, if the real owner is left out.

However, where the condemnor makes a deposit subsequent and in addition to the initial deposit upon which an order of possession was based, nothing in HRS ch. 101 expressly requires that sum to be paid to the clerk of the court unconditionally for the use of the condemnee.[6]

If a condemnor were free to withhold arbitrarily its consent to a distribution of an additional deposit of estimated just compensation, it is evident that the right to interest under HRS § 101-33 could be circumvented in substantial measure. By making an unconditional initial deposit of estimated just compensation that was intentionally low, the condemnor could obtain possession under HRS § 101-30 and stop interest on the amount deposited under HRS § 101-33. The condem-

---

[6] On the other hand, nothing in HRS ch. 101 expressly authorizes additional conditional deposits of estimated just compensation. While HRS § 101-31 provides that "[i]f an additional deposit of money has been paid to the clerk of the court pursuant to section 101-28 the amount of the additional deposit or of any portion thereof, *shall not, without the consent of the plaintiff, be paid to the party [entitled thereto]*" (emphasis added), this authorization of conditional payment is limited to a situation in which "the plaintiff is not the state or a county" and in which the court requires, upon motion by the *defendant,* an additional amount of money as security. HRS § 101-28.

nor could then proceed to make an "additional deposit" which conformed the total deposited estimate to a more realistic assessment of actual fair market value, and withhold consent to its distribution. Since the second sum, too, would be a "deposit" under HRS § 101-33, the condemnee would not be entitled to interest thereon, and any blight of summons damages due him under section 101-33 would be based solely on the amount by which the final jury award exceeded *both* deposited estimates.

The anomaly of such a result is even more apparent from a comparative reading of HRS § 101-32, which allows a plaintiff who has not already done so to obtain possession of condemned property by depositing the full adjudicated amount of just compensation with the court pending appeal of the verdict, which deposit "shall be held by the clerk until the entry of final judgment." Any deposit of estimated just compensation under this section, however, carries interest for the account of the condemnee to the extent that the verdict is upheld on appeal. The purpose of HRS § 101-32 is to allow the condemnor to obtain possession of property as to which the amount of just compensation has already been adjudicated, while at the same time to protect the condemnor's interests in the deposited sum in the event the adjudicated amount is held excessive on appeal. In providing that the deposited sum carries interest on behalf of its true owners during the impoundment by the court, however, section 101-32 insures that the condemnee eventually receives compensation for the loss of use of the money representing the true fair market value of his taken property.

By conditioning its second deposit in this case on a distribution order containing "protective measures," the City and County attempted to safeguard its interests pending appeal in a fashion analogous to the provisions of HRS § 101-32. However, it sought to avoid the cost of this safeguard by arguing that the condemnees were not entitled to interest for the loss of use of this sum during the fourteen-day period between May 19, 1972 (the date of deposit) and June 2, 1972 (the date of distribution by the trial court). In our opinion, such a tactic is out of keeping with the purpose of HRS §

101-33 to allow interest as part of just compensation on the amount by which the final award exceeds the deposited estimate giving rise to the order of possession. *See* 3 NICHOLS § 8.713[2], at 229. Under section 101-33, interest on this excess is computed from the date of the order of possession until "paid by the plaintiff" directly to the defendant. On the other hand, interest is not allowed on money "paid by the plaintiff to the clerk of the court from the date of payment." In order to avoid the anomalous and unjust result of depriving a condemnee of compensation for the loss of use of "additional deposits" of estimated just compensation made subsequent to an order of possession, we hold that such money "paid by the plaintiff to the clerk of the court" must be unconditionally for the use of the persons entitled thereto, *cf.* HRS § 101-30, in order to escape interest charges under HRS § 101-33. Compare *City & County v. Bishop Trust Co.,* 48 Haw. 444, 479-84, 404 P.2d 373, 393-96 (1965) (interest as blight of summons damages runs on amount of just compensation fully stipulated to between the parties, but not yet paid to condemnee).

Since we reverse the judgment and remand for a new trial on the issue of just compensation, however, we do not necessarily hold that MPL is entitled to the entire amount of interest awarded by the trial court on the second deposit. It may be that a new trial will result in a figure for just compensation at or less than the amount of the first deposited estimate, $961,500.00. In that event, of course, MPL would have no claim on the principal amount of the second deposited estimate, and *a fortiori* no claim for interest thereon. We hold that only to the extent, if any, that the new award of just compensation exceeds $961,500.00 by an amount not greater than the second deposited estimate, $75,071.61, was MPL properly compensated by the trial court under HRS § 101-33 for interest computed thereon until the date of distribution.

## II. THE APPEAL OF MARKET PLACE, LIMITED

### A. The "Development Approach" to Valuation of the Subject Property

At trial, MPL and DHS naturally attempted to establish as

high a fair market value as possible for the subject land. In doing so, they sought to pursue several lines of evidence, all foreclosed by the trial court, relating to the enhanced value of the land as a condominium project — a use different from its use as residential property at the time of the taking. Basically, this evidence consisted of the following: (1) the proposed sales prices of the condominium units; (2) the "Developer's Lease," including its ground rental provisions; (3) the condominium document file which DHS registered for approval with the Real Estate Commission, containing costs, prices and other financial data; (4) printed promotional brochures on the project; (5) testimony of the expert witness Marion Blair on market demand for the proposed condominium units; and (6) appraisal testimony of the expert witness William Alexander based on a "development approach" to valuation.

At the outset, we note the basic proposition that "[m]arket value is not limited to the value for the use to which the land is actually devoted, but it may have a potential use value." *Hawaii Housing Authority v. Rodrigues,* 43 Haw. 195, 197 (1959). In determining potential use value, "[a]ny competent evidence of matters, *not merely speculative,* which would be considered by a prospective vendor or purchaser or which tend to enhance or depreciate the value of the property is admissible." *Territory v. Adelmeyer,* 45 Haw. 144, 147-48, 363 P.2d 979, 982 (1961) (emphasis added).

As the foregoing principles suggest, the general aim of proceedings in eminent domain is to arrive at an amount of just compensation which as nearly as possible approximates the value which a free market would attach to the taken property. On the other hand, while prospective buyers of property in normal conditions would consider *all* matters subject to scrutiny which conceivably may affect the value of the property, juries in eminent domain proceedings are insulated from the realities of the marketplace and hence are not equipped to give proper weight to indicia of highly remote values. Consequently, courts generally exclude evidence of values which, in their estimation, are so "speculative" as to be unduly confusing to the jury. *Id.; see* 1 ORGEL § 31.

However, once a "reasonable argument is made for . . . a probable use," *Atlantic Coast Line R.R. v. United States*, 132 F.2d 959, 963 (1943), competent evidence tending to show the value of that use should be admitted. *Compare Wolff v. Commonwealth of Puerto Rico*, 341 F.2d 945, 946 & n.3 (lst Cir. 1965). Perhaps the most important consideration in the valuation of income-producing property is the anticipated income from that property. When discounted at a rate which reflects both the time value of money and all the risks appropriate to the particular enterprise, that income stream is generally considered to be by definition the "value" of the property. *See generally* V. BRUDNEY & M. CHIRELSTEIN, CASES AND MATERIALS ON CORPORATE FINANCE pt. I (1972). Although a proposed use of property as an income-producing enterprise is merely in the planning stage at the time of its taking by condemnation, this factor alone should not operate to *exclude* competent evidence of the value that the market would apply to the enterprise in light of its chances of success; rather, it should affect the weight that the jury may properly give to such evidence. *City & County v. Bishop Trust Co.*, *supra* at 466-67, 404 P.2d at 387; *see United States v. 25.406 Acres of Land*, 172 F.2d 990 (4th Cir.), *cert. denied*, 337 U.S. 931 (1949); *Dash v. State*, 491 P.2d 1069 (Alas. 1971).

This is not to say, of course, that a condemnee is free to introduce fanciful estimates of income or raw data on hoped-for profits as evidence of value in eminent domain proceedings. *United States v. 25.406 Acres of Land*, *supra* at 994. In *City & County v. Bonded Investment Co.*, *supra* at 389-90, 507 P.2d at 1088-89, we held that it was error for a trial court to admit unrefined estimates of anticipated profits from a condominium project still in the planning stage, either as the *measure* of just compensation for the taking of an undeveloped lot, or as *evidence* of value thereof. This evidence was clearly not the measure of just compensation, since it failed to reflect the risks of non-fruition applicable to the project at the time of the taking. *Cf. Hawaii Housing Authority v. Rodrigues*, *supra*. Moreover, raw data prepared by the condemnee on its estimated profits from the anticipated development were not properly admitted as evidence of value, since they

were "speculative" in the sense discussed above, *viz.*, as unadorned estimates, they carried the danger of being impressive to the jury beyond their probative weight.

*Bonded Investment* did not suggest, however, as the City and County would have us now hold, that income stream analysis in valuing undeveloped property is per se too "speculative" to be countenanced. In *City & County v. Bishop Trust Co., supra* at 467-68, 404 P.2d at 387, this court indicated that it was acceptable for expert appraisers to use the income approach in valuing property at a use different from that to which it was actually put at the time of condemnation. Evidence of anticipated income from property which was used as a bowling alley at the time of the taking, but which had a realistically better use as an office building, we held to be the proper basis for expert opinion of value. See also *United States v. Waterhouse*, 132 F.2d 699 (9th Cir. 1943), *aff'd by an equally divided Court*, 321 U.S. 743 (1944).

From a harmonizing reading of *Bishop Trust* and *Bonded Investment*, the following principles emerge: A trial judge may properly reject unrefined figures with respect to profits or rentals on a project still in the planning stage as inadmissible evidence of value, since a jury may be incapable of assigning them their proper weight and hence they may be overly prejudicial to the condemnor. See also 5 NICHOLS §19.22[2], at 19-24 to 25. On the other hand, evidence showing that a certain income-producing use at the time of condemnation was reasonably probable should be admitted. Once the trial court is persuaded by this evidence that the argued use is not so fanciful as to confuse the jury, expert testimony utilizing legitimate income stream analysis is wholly appropriate and should be admitted. *Compare City & County v. Bishop Trust Co., supra with Dash v. State, supra.*

In light of the foregoing general guidelines, the trial court was correct in excluding the first four pieces of evidence noted above, offered by MPL and DHS for the purpose of bolstering their "development approach" to valuation. The proposed sales prices of the condominium units, ground rental provisions in the lease, and the costs, prices and other financial data in the condominium document file reflected

only the parties' hoped-for realization of profits from the project. They were offered as evidence of value in and of themselves, and as such were properly rejected by the trial court in view of the likely propensity of the jury to over-estimate their probative values. *City & County v. Bonded Investment Co., supra.* Similarly, the printed promotional brochures on the project offered by DHS contained the type of sales "puffing" generally endemic to such literature, and hence were properly rejected as evidence of value because they portrayed a misleadingly optimistic picture of the project's quality and chances of success.[7]

The trial court erred, however, in rejecting the testimony of Marion Blair with respect to market demand for the pro-posed condominium units. This testimony was offered by MPL in an attempt to make a "reasonable argument . . . for . . . a probable use" of the subject property as a condominium project — a use which was more valuable than its actual use at the time of the taking. *Atlantic Coast Line R.R. v. United States, supra* at 963; *see Hawaii Housing Authority v. Rodri-gues, supra* at 197. The trial court rejected Marion Blair's testimony not on the ground that she lacked the qualifi-cations of a real estate expert, but on the ground that "[t]he facts, themselves, show there was no demand. How can any person say there is such a demand?" The trial court's state-ment in this regard referred to the failure of DHS to sell any of the units by the time of the condemnation. However, the parties to the undertaking themselves evidently considered the proposed enterprise still viable, since MPL did not exer-cise its power to terminate the lease and since DHS went to the expense of a mandamus action in court to compel the City Council to issue a building permit for the project. The ques-tion of demand for the type of units contemplated for the

---

[7] Of course, the cost of these brochures may be admissible as evidence under the reasoning of the first part of this opinion, since they constituted expenditures in the development of the property to an arguably more valuable use. As such, under *State v. Chang, supra,* they would be relevant evidence showing enhancement of the value of the land, since a hypothetical buyer at the time of the taking would consider these expenditures to be costs that he would not have to incur in developing the land, and hence, capital assets. *See* Kimball Laundry Co. v. United States, 338 U.S. 1, 18 (1949).

subject land, and hence the reasonable probability of its more valuable use in development thereof, was crucial to the issue of just compensation. *See, e.g., City & County v. Collins,* 42 Haw. 199, 217-18 (1957), *quoting Olson v. United States,* 292 U.S. 246, 255-56 (1934). The trial court should not have assumed there to be no demand when MPL offered to show the contrary by competent expert testimony.

Appraiser William Alexander's testimony on the value of the subject property as a condominium project was based upon the income stream approach (denominated the "development approach" by MPL), and was also rejected by the trial court. However, the admissibility of this testimony turned on MPL's ability to make a showing of a reasonable probability of such a use. If the court had allowed Marion Blair to testify to this effect, then expert testimony of value utilizing risk and return analysis, *cf.* V. BRUDNEY & M. CHIRELSTEIN, *supra passim,* would have been entirely appropriate under *City & County v. Bishop Trust Co., supra.* It follows that at the new trial on remand of this case, expert testimony based on this approach to valuation should be rejected only if there is not first shown a reasonable probability that the subject property could have been used in a condominium development at the time of the taking. The purpose of such an initial showing, as noted previously, is to exclude evidence of value which, although relevant data in transactions on the open market, has a dangerous propensity overly to impress the jury.[8]

## B. *Evidence of the Park Ordinance and a Reasonable Probability of Re-Zoning to a More Valuable Use*

A major goal of the valuation process in eminent domain proceedings is to determine market conditions for the taken property as though no condemnation had ever been contemplated. *State v. Heirs of Kapahi,* 48 Haw. 101, 113, 395 P.2d 932, 939 (1964); *Territory v. American Security Bank,* 43 Haw. 167 (1959); *see* 1 ORGEL §§ 21-22. Implicit in the constitutional

---

[8] Of course, there would be greater leeway for the allowance of "speculative" evidence of value in an eminent domain proceeding where a judge, rather than a jury, sits as fact-finder. *See* 1 ORGEL § 31, at 153-54 n.136.

requirement of just compensation is the premise that the condemnor may not bootstrap itself to a lower value for taken property by showing that the very act of taking itself and the preparations therefor adversely affected market conditions, thereby lowering "fair market value" or eliminating a "reasonably probable use." *See, e.g., United States v. Virginia Electric & Power Co.*, 365 U.S. 624, 635-36 (1961) ("The court must exclude any depreciation in value caused by the prospective taking once the Government 'was committed' to the project").

The trial court in this case admitted evidence of the City ordinance passed on August 5, 1969, designating the subject property for public use in the extension of Kapiolani Park. This evidence was offered by counsel for the City and County, and accepted by the trial court, "to show the status of the subject property on August 25, 1969" (the date of summons). The ordinance was part of the general design of the City and County to extend the park and condemn the subject property. Its admission destroyed the prophylaxis against evidence of lessened value resulting from the taking itself which it was a major responsibility of the trial judge to maintain. Compare *Territory v. American Security Bank, supra.* The error should not be repeated at the re-trial of this case.

MPL also complains that the trial court erred in excluding the testimony of Frank Skrivanek, a former planning director for the City and County of Honolulu, as to a reasonable probability of re-zoning in the Diamond Head area at the time of the taking from single-family residential to low-density apartment. The record shows that the reason adopted for the exclusion was because re-zoning along this line "was never adopted." It was improper to exclude Mr. Skrivanek's testimony on this ground. A reasonable probability of re-zoning to the very use for which the condemnees planned to develop the property, prior to the initiation of plans to extend Kapiolani Park, would be highly relevant to the chances of success for the project and hence to its greater value as such. *See, e.g., Wolff v. United States, supra.* The trial court therefore should not have foreclosed this line of evidence. *See State v. Midkiff*, 55 Haw. 190, 516 P.2d 1250 (1973).

## C. *The Appraisal Testimony of Jack Palk*

As part of its case on fair market value, MPL offered the appraisal testimony of Jack Palk, a real estate consultant and former title company president. Mr. Palk's testimony on *voir dire* demonstrated that he possessed considerable experience in Hawaiian real estate generally, but very limited experience in appraisals of large residential properties[9] and no experience in appraisals of condominium projects. In view of his limited familiarity with the valuation problems that were likely to arise in this case, Mr. Palk was properly disqualified as an expert by the trial court. Certainly under the narrow standard applicable to appellate review of a trial court's determination of a witness' qualifications as an expert, *see* E. CLEARY, McCORMICK'S HANDBOOK OF THE LAW OF EVIDENCE § 13 (2d ed. 1972); 1 ORGEL § 132, at 565, we cannot conclude that MPL has shown any "abuse of discretion" requiring us to reverse the decision of the trial court on this point. *Territory v. Adelmeyer, supra* at 148, 363 P.2d at 982.

### III. CONCLUSION

All other points of error advanced by the parties we find to be without merit. The case is reversed and remanded for a new trial in conformity with this opinion.

*Robert K. Richardson,* Deputy Corporation Counsel *(Richard K. Sharpless,* Corporation Counsel, of counsel) for plaintiff-appellant, cross appellee.

*Ted T. Tsukiyama,* for defendant-appellee, cross appellant.

*John H. Robinson,* for defendant-appellee.

### CONCURRING AND DISSENTING OPINION OF MARUMOTO, J.

I dissent with respect to the rate of interest to which MPL is entitled for blight of summons damages, for the reason

---

[9] Mr. Palk testified that he had appraised, in addition to the subject property, only one other residential property of near-comparable size and value.

stated in *City and County of Honolulu v. Bonded Investment Company*, 54 Haw. 523, 528, 511 P.2d 163, 166. Otherwise, I concur.

### DISSENTING OPINION OF HAWKINS, CIRCUIT JUDGE

I respectfully dissent from that portion of the majority opinion which reverses the action of the trial court in directing a verdict of $86,373.61 for damages to DHS Corporation. This amount was awarded to the lessee for its expenditures that were incurred in developing the property for condominium use.

In 1968 article 1, section 18 of the Hawaii Constitution was amended to add the words "or damaged." The amended section now reads:

Private property shall not be taken or damaged for public use without just compensation.

The Standing Committee in recommending the amendment submitted the following examples:

In a case involving a landlord-tenant situation, there is no compensation to the tenant even in cases where termination of his occupancy will greatly damage his property. When land and buildings are condemned, the owner receives compensation but the tenant is often not compensated even if the tenant will then be deprived of that use and be forced to move at considerable cost. This most often affects small businesses that are forced to move all their equipment.

There is no compensation for plans and drawings that are made for the future use of any property. Architectural designs, drillings, etc. are often made, only to have the owner find that they are worthless after his property has been condemned.

Standing Committee Report No. 55, 1 PROCEEDINGS OF THE CONSTITUTIONAL CONVENTION OF HAWAII OF 1968, at 235 (1973).

The Committee of the Whole in recommending the adoption of the amendment made the following report:

Your Committee's reference to and consideration of

250

the law developed in other jurisdictions was to satisfy your Committee that the phrase "damaged for public use" within the instant context is not so vague and indefinite as to escape practicable applicability. The established body of law will be helpful and will provide guidance to our courts; however, it is not your Committee's intent that our courts be bound by each precedent in every case. It should also be noted that it is not the intent of your Committee that our courts be guided or controlled in any way by the several specific examples mentioned on page 8 of Standing Committee Report No. 55 and in the debates of your Committee of the Whole.

Committee of the Whole Report No. 15, *id.* at 357.

It seems clear from the above that the delegates in adopting the amendment to article 1, section 18 of the State Constitution intended that the citizens of Hawaii who suffer losses which are caused by eminent domain should be compensated.

I would affirm the trial court's directed verdict in favor of DHS Corporation.