921 P.2d 92

HOUSING FINANCE AND DEVELOP-
MENT CORPORATION, a public body
and body corporate and politic, Plain-
tiff–Appellee,

v.

Matsuo TAKABUKI, Myron Bennett
Thompson, William Shaw Richardson,
Henry Haalilio Peters, Oswald Kofoad
Stender, Trustees under the Will and of
the Estate of Bernice Pauahi Bishop,
deceased, Defendants/Lessors–Appel-
lants–Cross Appellees,

and

Esther Mary Abbey; Hollinger Kimo Ab-
bey; John Malulani Aki, Jr.; Lydia Choi
Aki; Dean David Choy; Debra Kay
Choy; Albert Denis Kealoha Costa;
Luana Kekahaualani Costa; Benjamin
Wayne D'Ooge; Judy Lynne D'Ooge;
Keith Noel Duarte; Martin Joseph Far-
rell; Robyn Edwards Farrell; William
Hajdu; Yayesh Hajdu; Deborah Mitsu-
ko Hamao–Duarte; Isabell Helton; Jack
Helton; Russell Gary Helton; Cas Ya-
suo Mahi Higa; Lori Eiko Higa; Gayle
Hyunyang Ishima; Miles Yoshinobu
Ishima; Alvin Yuk Hoon Kam; Betty
Joane Kam; Nishat Jahan Kazi; Sirazul
Islam Kazi; Michael K. Lee, also known
as Michael Keith Lee; Etsuko Meyer;
Michael Roy Meyer; Greg Kazuo Noji;
Julie Kiyomi Noji; Harvey Masao Osaki;
Karen Matsue Osaki; Lillian Kazue
Ota; Kanit Raktakanishta, now known
as Ken Rakta; Roann Rho Raktakan-
ishta, now known as Roann Chong Hee
Rakta; Jan Parry Randle; Michael
Charles Randle; Pui Hin Wong Rhoads;
Samuel Edward Rhoads; Peggy Miyako
Taggart; William McKee Tam; Cynthia
Hope Tinsley; Larry Robert Tinsley, De-
fendants/Lessees–Appellees,

and

Christine Oi Wun Chee; William Kum Siu
Chee; Duane Sung Soo Kim; Miyo Mi-
yasaki–Kim; Aleza Matayoshi; Eric
Zenko Matayoshi; Donna Carrie True-
love, also known as Donna C. Truelove;
Michael Ray Truelove; John Does 1–200;
Mary Does 1–200; Doe Partnerships 1–
50; Doe Corporations 1–50; Doe "Non-
Profit" Corporations 1–50; and Doe En-
tities 1–50, Defendants/Lessees,

and

Denise Suzanne Flaman; Lawrence Gus-
tav Flaman, Jr.; Jerel Dan Fonseca;
Karen Lee Fonseca; Jeanette Marie
Miller; Paul Ira Miller; Henrik Vang
Petersen; Michiko Petersen, Defen-
dants/Lessees–Appellees–Cross Appel-
lants.

No. 17075.

Supreme Court of Hawai'i.

June 26, 1996.

C. Michael Hare (Dennis J. Gaughan with him on the briefs of Cades, Schutte, Fleming & Wright), Honolulu, for defendants/lessors-appellants-cross appellees.

Thomas T. Watts of Kemper & Watts, on the briefs, Honolulu, for defendants/lessees-appellees-cross appellants.

Carolee M. Aoki (Sonia Faust and John C. Wong with her on the brief), Deputy Attorneys General, Honolulu, for plaintiff-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

KLEIN, Justice.

Defendants/lessors-appellants Matsuo Takabuki, Myron Bennett Thompson, William Shaw Richardson, Henry Haalilio Peters, and Oswald Kofoad Stender, in their capacities as trustees under the will and of the estate of Bernice Pauahi Bishop, deceased, (hereinafter the Trustees) appeal from the separate judgments entered by the circuit court, pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 54(b), in an action brought by the plaintiff-appellee Housing Finance and Development Corporation (HFDC) under Hawai'i Revised Statutes (HRS) Chapter 516 to condemn the leased fee interests of thirty-two houselots in the Haiku Knolls subdivision, located in Kane'ohe on the island of O'ahu. The Trustees argue that the circuit court erred when it entered thirty-two separate judgments, one for each of the houselots involved in the proceedings. For the reasons set forth below, we agree with the Trustees' argument and, accordingly, vacate the judgments that are involved in this appeal.[1]

## I. BACKGROUND

### A. The Hawai'i Land Reform Act

In 1967, after extensive investigations and hearings, the Hawai'i legislature determined that there was a disproportionate concentration of land ownership in Hawai'i "by a small group of estates, trusts, and private landowners, some of whom have chosen to lease their land for residential use rather than to sell it." *Hawaii Housing Authority v. Lyman*, 68 Haw. 55, 63, 704 P.2d 888, 893 (1985) (citing 1967 Haw. Sess. L. Act 307, § 1 at 488–89) (footnote omitted). The legislature found that this concentration of ownership of residential land and the owners' decisions to lease rather than sell their fee simple titles resulted in "a serious shortage of fee simple residential land and in an artificial inflation of residential land values," which deprived the people of Hawai'i of "a choice to own or take a lease of the land on which their homes are situated[.]" HRS § 516–83 (1993). It further found that these results adversely affected the state's economy, the public interest, and the health, welfare, security, and happiness of the people of Hawai'i. *Id.*

To remedy these problems, the legislature in 1967 enacted the [Hawai'i] Land Reform Act, HRS Chapter 516, providing for the condemnation and subsequent transfer of the residential fee interest to the lessee. Its stated intent is to increase the availability, alienability and turnover of single family residential lots, spread ownership of fees simple, disperse the oligopolisitic market power of the large landowners, and stabilize prices, inflation, and the state's economy by containing the cost of living and the cost of public assistance.

*Lyman*, 68 Haw. at 64, 704 P.2d at 893 (citing HRS § 516–83 (1976); 1967 Haw. Sess. L. Act 307, § 1 at 488–90) (footnote omitted); *see also Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 232–34, 104 S.Ct. 2321, 2324–26, 81 L.Ed.2d 186 (1984). Briefly, HRS Chapter 516, the Hawai'i Land Reform Act (HLRA), provides that, when a sufficient number of lessees of houselots [2] in a development tract of at least five acres file applications with the HFDC, the HFDC may, after public notice and hearing, designate "all or a portion of" the development tract for acquisition by eminent domain or purchase under threat of eminent domain if it finds that the acquisition will effectuate the public purposes of the HLRA—*i.e.*, increasing the availability and redistributing the ownership of fee simple residential lands. HRS § 516–22 (1993). Acquisition of any property under the HLRA must be for fair market value. HRS § 516–1 (1993).

---

1. The Trustees also argue that the circuit court erred in concluding that blight of summons damages stopped accruing on the date that funds sufficient to pay the fair market value of the condemned leased fee interests were deposited with the clerk of the circuit court. Because the parties stipulated to the dismissal of the appeal with respect to all of the houselots for which funds had been deposited, *see infra* note 8, and because we are vacating the judgments with respect to the houselots that remain in this appeal, we do not reach the blight of summons issue.

2. HRS § 516–1 (1993) defines "houselot" as "a parcel of land, two acres or less in size, which is used or occupied or is developed, devoted, intended, or permitted to be used or occupied as a principal place of residence for one or two families."

### B. *Haiku Knolls Subdivision*

On April 23, 1990, the lessees of thirty-two of the seventy-six residential leasehold lots in the Haiku Knolls subdivision in Kaneʻohe requested the HFDC to acquire the leased fee interests of their lots pursuant to the HLRA. The Trustees owned the leased fee interests of the lessees' houselots.

Pursuant to HRS § 516–22, the HFDC held a public hearing, on July 17, 1990, regarding the proposal to designate "all or a portion of" the subdivision for acquisition of the leased fee interests therein. On May 10, 1991, the HFDC adopted Resolution 148, which contained a finding that

> the acquisition of the leased fee interest in the residential houselots in all or part of the Haiku Knolls Subdivision through exercise of the power of eminent domain or by purchase under the threat of eminent domain and the disposition thereof, as provided in [HRS] Chapter 516 . . ., will effectuate the public purposes of [HRS] Chapter 516[.]

Resolution 148, as amended by Resolution 151, designated the aforementioned thirty-two houselots for acquisition of their leased fee interests.

On June 26, 1991, the HFDC filed a complaint in the circuit court for condemnation of the leased fee interests of the thirty-two houselots that had been designated. On February 28, 1992, the HFDC filed a motion for partial summary judgment on the issue of whether the condemnation of the leased fee interests of the designated lots satisfied the constitutional public use requirement.[3] The HFDC argued that the Hawaiʻi Supreme Court in *Lyman, supra,* and the United States Supreme Court in *Midkiff, supra,* had held that condemnations conducted in accordance with the HLRA were constitutional— *i.e.,* that they satisfied the public use clauses of the Hawaiʻi and United States Constitutions. Therefore, the HFDC argued, as long as it demonstrated compliance with the procedural requirements of the HLRA, the condemnation of the leased fee interests of the designated lots in the Haiku Knolls subdivision was constitutional. Finally, the HFDC contended that it had complied with the procedural requirements of the HLRA.

The circuit court apparently agreed with the HFDC and entered an order on June 18, 1992, granting the HFDC's motion for partial summary judgment.

Then, in October 1992, the Trustees made two motions to dismiss certain of the lessees from the condemnation action for failure to qualify to purchase under HRS § 516–33 (Supp.1992).[4] These motions were denied by the circuit court.

---

**3.** Article I, section 20 of the Hawaiʻi Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." The fifth amendment to the United States Constitution, which is applicable to the states through the due process clause of the fourteenth amendment, *see Chicago, B. & Q.R. Co. v. Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897), similarly provides in pertinent part that "property [shall not] be taken for public use, without just compensation."

**4.** HRS § 516–33 sets forth the "[q]ualifications for purchase" that a person must meet to be eligible to purchase the leased fee interest in a houselot condemned by the HFDC under the HLRA. At the time that the condemnation proceeding in the instant case commenced, the qualifications included, inter alia, requirements that the person be at least eighteen years of age, be a bona fide resident of Hawaiʻi or have a bona fide intent to reside in the development tract, and have a "letter of credit, certificate of deposit, proof of funds, or approved application from any lending institution demonstrating that the person will be able to promptly pay the [HFDC] for the

leased fee interest in the lot[.]" HRS § 516–33 (Supp.1992). At that time, HRS § 516–33 (Supp.1992) stated only that the qualifications were required to be met before the "sale of any residential houselot within a development tract shall be made[.]" One of the prerequisites to designation, however, is that a sufficient number of lessees "have applied to the [HFDC] to purchase the leased fee interest in their residential leasehold lots *pursuant to section 516–33* [.]" HRS § 516–22 (emphasis added). Thus, in *Housing Finance and Development Corp. v. Castle,* 79 Hawaiʻi 64, 88, 898 P.2d 576, 600 (1995), we recognized that only applications that were "in conformity with the preconditions enumerated in HRS § 516–33" could be validly considered by the HFDC.

HRS § 516–33 was amended in 1993 so that the qualifications to purchase are now expressly required to be met before "an application to purchase shall be accepted" as well as at the time of sale. HRS § 516–33 (1993). In addition, the second qualification has been amended to require that the person be "a bona fide resident of the State *and* reside[ ] on the lot, except

A trial began on November 2, 1992, to determine the fair market value of each of the thirty-two leased fee interests to be condemned—*i.e.*, the compensation owed to the Trustees for the taking of their property. On November 18, 1992, the jury returned a special verdict quantifying the fair market value of each of the leased fee interests.

Subsequently, after holding an evidentiary hearing, the circuit court ordered that the rate of interest to be used to calculate the blight of summons damages[5] owed to the Trustees would be eight percent simple (*i.e.*, uncompounded) interest per annum, accruing from the date of summons, June 26, 1991, until the date of payment to the Trustees in accordance with the judgment to be entered.

On March 30, 1993, the circuit court entered findings of fact (FOF) and conclusions of law (COL) based on (1) the jury's special verdict, (2) the evidentiary hearing on blight of summons damages, and (3) the submissions of the parties regarding the Trustees' motions to dismiss certain lessees for failure to qualify to purchase. Among other things, the COL included the following:

1. Pursuant to [HRS §§ 516–22 and –23], Plaintiff [HFDC] may acquire, through the exercise of its power of eminent domain, the Defendant Trustees' interest in any of the thirty-two houselots involved in this action. Plaintiff may acquire the Defendant Trustees' interest in different lots at different times, provided that any such acquisition by Plaintiff shall occur within the time limits specified in [HRS Chapters 516 and 101;] the compensation to be paid to Defendant Trustees shall be determined as of the date of summons of the complaint in eminent domain.

. . . .

5. Just compensation in this case requires an award of blight of summons damages calculated at a rate of 8% per annum on the fair market value of the leased fee interest in each lot, simple interest and not compounded, from June 26, 1991 to the date of payment by HFDC to Defendant Trustees, or the date of deposit with the court pursuant to chapter 101, Haw.Rev.Stat., less any lease rents received by Defendant Trustees during the same time period.

. . . .

7. Plaintiff [HFDC] may acquire the Defendant Trustees' interest in any of the thirty-two houselots involved in this action even if the lessee of the lot does not meet the qualifications for purchase set forth in [HRS § 516–33].

8. Upon acquisition from the Defendant Trustees, Plaintiff may sell the leased fee interest in any of the thirty-two houselots involved in this action to any person who meets the qualifications set forth in [HRS § 516–33], even if that person is different from the person who originally submitted an application to Plaintiff.

. . . .

10. Pursuant to [HRCP Rule 54(b)], there is no just reason for delay, and the court directs that separate final judgments be entered with respect to each of the thirty-two houselots involved in this proceeding.

On April 8, 1993, in accordance with COL No. 10, the circuit court entered thirty-two separate final judgments against the Trustees and in favor of the HFDC for condemnation of the leased fee interests of each of the houselots involved in the proceedings. Each final judgment remained subject to a final

in hardship circumstances as determined by the [HFDC] on a case by case basis . . .; provided further that if either the person or the lessor disagree with the [HFDC]'s determination, they shall be entitled to a contested case proceeding under chapter 91 in which both the person and the lessor shall be parties." HRS § 516–33(2) (1993) (emphasis added).

5. In general, blight of summons damages represent the "indemnification due a condemnee for the damages resulting from the government's delay in paying the full cash equivalent of the property taken on the date of summons." *City*

*and County of Honolulu v. Market Place, Ltd.*, 55 Haw. 226, 235, 517 P.2d 7, 15 (1973); *see also Hawaii Housing Authority v. Midkiff*, 69 Haw. 247, 249, 739 P.2d 248, 249 (1987) ("the condemning authority must pay interest, subject to set-off for rents received, so as to put the property owner in the same position as if payment had been made contemporaneously with the summons"). Their purpose "is to compensate a condemnee for the loss of use of the cash equivalent of the taken property[.]" *Market Place, Ltd.*, 55 Haw. at 237, 517 P.2d at 16.

order of condemnation pursuant to HRS § 101–26 (1993).[6]

Thereafter, funds were deposited with the clerk of the circuit court, for the express purpose of paying to the Trustees the just compensation owed for the leased fee interests of six of the houselots.[7] Each of the six deposits was sufficient to pay the fair market value of the leased fee interests of the respective lots; five of the deposits also provided funds sufficient to pay the blight of summons damages that had accrued as of the dates of the deposits.

On May 7, 1993, the Trustees filed a timely notice of appeal from twenty-eight of the final judgments.[8]

## II. DISCUSSION

■ The Trustees contend that the circuit court's COL Nos. 1, 7, 8, and 10 are wrong and that the circuit court erred when it entered separate judgments for each of the thirty-two houselots involved in the condemnation proceedings. They argue that "the collective result" of the circuit court's COL and its entry of the thirty-two separate judgments is that the "HFDC may condemn as few as one lot, even if the Lessee of that lot does not qualify [to purchase the lot] under [HRS] § 516–33."

6. HRS § 101–26 provides:
 **Final orders of condemnation.** When all payments required by the final judgment have been made, the court shall make a final order of condemnation, which shall describe the property condemned and the purposes of the condemnation, a certified copy of which shall be filed and recorded in the office of the registrar of conveyances, and thereupon the property described shall vest in the plaintiff.

7. The deposits relating to two of the houselots were initially deposited by the lessees of those houselots before the final judgments with respect to those lots had been entered. One of these deposits was later assigned to the HFDC. The other four deposits were made directly by the HFDC after the thirty-two final judgments had been entered.

8. Prior to the filing of the notice of appeal, pursuant to HRCP Rule 41(a)(1)(B), all claims relating to four of the lots were dismissed by stipulation of the parties. Since the filing of the notice of appeal, pursuant to Hawai'i Rules of Appellate Procedure Rule 42, the claims relating to twenty-five of the remaining lots, including all six of the lots for which deposits had been made, have been dismissed.

As explained below, the HLRA only authorizes the HFDC to institute a single condemnation proceeding of a specifically designated portion of a development tract and does not allow that proceeding to be judicially divided into multiple condemnations of individual lots. Therefore, we agree with the Trustees that the circuit court erred when it entered the thirty-two separate judgments.

A. *The entry of separate judgments is inconsistent with the "condemnation-in-bulk" approach chosen by the legislature.*

As the Trustees contend, one logical consequence of allowing a condemnation proceeding under the HLRA to be subdivided by the granting of separate judgments for each houselot involved is that "as few as one lot" could ultimately be acquired. The dissent embraces this argument, suggesting that the preconditions for designation by the HFDC of all or a portion of a development tract for acquisition under HRS § 516–22 may result in the designation and "actual condemnation" of the leased fee interest in a single houselot.[9] Dissenting opinion at 185–86, 921 P.2d at 105–106.

The dissent points out that HRS § 516–22 "does not expressly require the HFDC to designate a minimum number of leased fee interests for condemnation" as long as it

With respect to the six lots for which deposits had been made, except as to one lot to which the parties agreed, due to special circumstances, to dismiss the appeal outright and refund the deposit, the stipulations to dismiss contained specific provisions whereby the parties would request orders from the circuit court regarding the effect of the deposits and would "retain their respective rights to appeal these orders filed by the Trial Court."

9. HRS § 516–22 (1993) sets forth the preconditions that must be met before the HFDC may designate land for acquisition:
 **Designation of leased fee interest in all or part of development tract for acquisition.** The corporation may designate all or a portion of a development tract for acquisition and acquire leased fee interests in residential houselots in such development tract, through the exercise of the power of eminent domain or by purchase under the threat of eminent domain *after twenty-five or more lessees or the lessees of more than fifty per cent of the residential lease lots within the development tract, whichever number is the lesser, have applied to the corporation* to purchase the leased fee interest in their residential leasehold lots pursuant to section 516–

"make[s] a separate finding that the acquisition of the designated leased interests . . . . . . will further the purposes of the Act." Dissenting opinion at 185, 921 P.2d at 105. The dissent then concludes that the minimum number of leased fee interests that could be designated for acquisition could be one. If that were the actual meaning of HRS § 516–22, we question why the statute requires that twenty-five or more lessees or more than fifty percent of the lessees in a single development tract, "whichever number is the lesser," apply to purchase their leased fee interests. A perfectly acceptable statute, under the dissent's view, would permit the leased fee owner of a single houselot to invoke the government's eminent domain power under the HLRA by filing an application with the HFDC and somehow convincing the agency that the "public purposes" of the Act would be satisfied if his or her leased fee interest were designated for condemnation. See Dissenting opinion at 186, 921 P.2d at 106 (arguing that "the HFDC could rationally and justifiably find that the actual condemnation of 'as few as one lot' would effectuate the purposes of the Act").

> 33 and if, after due notice and public hearing, the time and place of which have been duly advertised in a newspaper of general circulation in the county in which the development tract is situated on at least three different days, the last publication being not less than five days before the date of hearing, the corporation finds that the acquisition of the leased fee interest in residential houselots in all or part of the tract through exercise of the power of eminent domain or by purchase under threat of eminent domain and the disposition thereof, as provided in this part will effectuate the public purposes of this chapter.
>
> (Emphases added.)

10. The conditions necessitating designation and acquisition of residential houselots under the HLRA include:

> a serious shortage of fee simple residential land and . . . an artificial inflation of residential land values in the State . . . , [which has deprived] the people of the State . . . of a choice to own or take a lease of the land on which their homes are situated and have been required instead to accept long-term leases of such land which contain terms and conditions that are financially disadvantageous, that restrict their freedom to fully enjoy such land and that are weighted heavily in favor of the few landowners of such land . . . [.] The economy of the State and the public interest, health, welfare, security, and happiness of the people of all the State are adversely affected by such

The dissent's interpretation of HRS § 516–22 fails for a number of reasons, not the least of which is that the exercise of the government's power of eminent domain under the HLRA can only effectuate the *public* purposes of the Act where a "simultaneous conversion of sizeable numbers of leasehold lots to individual fee simple ownership" may occur. Sen. Stand. Comm. Rep. No. 630, in 1975 Senate Journal, at 1071. In other words, strict adherence to the express public purposes of the HLRA is foundational to the constitutionality of the Act. It is incomprehensible how the designation for acquisition of the leased fee interest in a single residential houselot could ever satisfy the express, lofty public purposes of the HLRA. See HRS § 516–83.[10] Such a result is in complete disharmony with the evolution of the statutory scheme.

When the HLRA was first enacted in 1967, the legislature specifically rejected portions of the proposed legislation that would have permitted condemnation of individual houselots. See Sen. Conf. Comm. Rep. No. 19, in

> [conditions]. . . . A substantive and significant contributing factor to the high and rising cost of living is the high cost of land whether leasehold or fee. . . . The rising cost of land tied to other cost of living increases is swelling the ranks of those persons unable to maintain a decent and healthful standard of life. If the inflationary trend of land continues unchecked, the resultant inflationary total cost of living could create such a large population of persons deprived of decent and healthful standards of life that the consequent disruptions in lawful social behavior could irreparably rend the social fabric which now protectively covers the life and safety of Hawaii's people. . . . The pervasive and substantial contribution made to inflation by high land values creates a potential for economic instability and disruption. . . . Inflation lessens the quality of life of all members of this afflicted society and is particularly invidious in its impact on the ninety plus per cent of the population who are in poverty, and low through middle income groups. The State has limited abilities to curb inflation and, perhaps, the only useful means available is the State's power to control land values. . . .
>
> HRS § 516–83(a). "[I]t is the purpose of this chapter to alleviate the conditions found in subsection (a) of this section . . . by providing for the condemnation of the fee simple title to . . . [residential] land [under long-term leases] and the payment of just compensation therefor by the State through the use of the power of eminent domain[.]" HRS § 516–83(b).

1967 Senate Journal, at 803 ("Part[ ] ... III of H.D.2 [has] been deleted.... Part III provided for condemnation of individual leasehold lots by the Hawaii Housing Authority on the application of the lessee of a single lot."). Instead, the legislature expressly chose to adopt only the "condemnation-in-bulk" approach. *Id.*

As originally enacted, the "condemnation-in-bulk" approach required the Hawai'i housing authority (HHA)[11] to designate and acquire the leased fee interests in the entire development tract. This proved unworkable. *See* 1975 Haw. Sess. L. Act 186, § 1 at 424 ("The legislature finds that although the Act has been in full effect for nearly six years it has not been implemented."). Consequently, in 1975, the legislature amended the HLRA to allow the HHA to designate and acquire the leased fee interests in "all or a portion of" a development tract. 1975 Haw. Sess. L. Act 184, § 2 at 410–18. Although the legislature's intent was to simplify the process by allowing for acquisition and disposition of less than the entire development tract, the legislative history makes clear that the legislature remained committed to the idea that the HLRA would "provid[e] for the *simultaneous conversion of sizeable numbers of leasehold lots* to individual fee simple ownership." Sen. Stand. Comm. Rep. No. 630, in 1975 Senate Journal, at 1071 (emphasis added).

■ A more rational reading of HRS § 516–22 than the dissent's "as few as one lot" position leads to the conclusion that the minimum number of applications requirement is inextricably linked to the penultimate agency decision to designate all of the applicants' leased fee interests for acquisition as well as the ultimate agency decision to acquire the leased/fee interests "so designated." *See* HRS § 516–23. Because the HFDC's public purpose determination is made in consideration of at least the statutory minimum number of applicants, it follows that the agency's designation and acquisition decisions can only fulfill the avowed public purposes of HRS chapter 516 if *at least* the statutory minimum number of leasehold lots are later acquired by the HFDC under HRS § 516–23.[12]

Moreover, it is clear that allowing the acquisition of the leased fee interest of "as few as one lot" does not accomplish the "simultaneous conversion of sizeable numbers of leasehold lots" and would, in effect, judicially authorize a procedure that the legislature specifically rejected. Thus, the agency's public purpose finding, based as it is on the simultaneous conversion of a sizeable number of leasehold lots, is made in consideration of the applications it has received.

B. *HRS §§ 516–22 and –23 require the HFDC to acquire and dispose of the leased fee interests of at least that number of houselots in the designated portion of the development tract as represented by the statutory minimum number of applicants either through formal condemnation proceedings, "purchase under the threat of eminent domain," or "voluntary action of the parties."*

Subject to certain preconditions, *see supra* note 9, HRS § 516–22 provides that the

---

11. "The Hawai'i housing authority was renamed the 'housing finance and development corporation' pursuant to HRS § 201E–3 (Supp.1992)." *Hawai'i Housing Authority v. Uyehara,* 77 Hawai'i 144, 146 n. 1, 883 P.2d 65, 67 n. 1 (1994). *See also Housing Finance and Dev. Corp. v. Castle,* 79 Hawai'i 64, 73 n. 1, 898 P.2d 576, 585 n. 1 (1995).

12. As we stated in *Housing Finance and Development Corp. v. Castle,* 79 Hawai'i 64, 898 P.2d 576 (1995):

[T]he HFDC may acquire leased fee interests, through the power of condemnation, in the residential houselots of all or part of a development tract if: (1) the lesser of twenty-five or more lessees or the lessees of more than fifty percent of the residential lease lots within the tract; (2) have applied to the HFDC to purchase their leased fee interests; (3) pursuant to the requisite qualifications of HRS § 516–33; and (4) the HFDC finds that the acquisition will effectuate the purposes of the HRLA.

Put more succinctly, pursuant to HRS § 516–22, the HFDC's sole function is to determine that the necessary *quantum* of lessees have *applied* for purchase of their leased fee interests in residential lots situated in a qualifying "development tract," *see* HRS § 516–1, ... in conformity with the preconditions enumerated in HRS § 516–33, and that the acquisition *by the HFDC* will *effectuate* the public purposes of the HLRA.

79 Hawai'i at 88, 898 P.2d at 600 (emphasis in original).

HFDC may "acquire leased fee interests in [designated] residential houselots ... through the exercise of the power of eminent domain or by purchase under threat of eminent domain[.]" HRS § 516–23 (1993) in turn authorizes the HFDC to acquire the land designated pursuant to section 516–22, providing in pertinent part:

> **Exercise of power of eminent domain.** Within twelve months after the designation of all or part of the development tract for acquisition, the housing finance and development corporation shall acquire *through voluntary action of the parties, or institute eminent domain proceedings to acquire* the leased fee interest in the tract or portion so designated[.]

(Emphasis added.)

 The scope of the authority that these provisions grant to the HFDC to designate and subsequently acquire leased fee interests is an issue of statutory interpretation.

> The interpretation of a statute is a question of law which this court reviews de novo. In addition, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning. Finally, in determining the purpose of the statute, we are not limited to the words of the statute to discern the underlying policy which the legislature seeks to promulgate but may look to relevant legislative history.

*State v. Wells,* 78 Hawai'i 373, 376, 894 P.2d 70, 73 (1995) (citations, quotation marks, brackets, and ellipsis points omitted).

 The language and legislative history of the HLRA strongly suggest that the legislature intended that HRS § 516–23 would require the HFDC to acquire and dispose of the leased fee interests in no less than that

portion of the development tract, represented by the statutory minimum number of applicants, which has been designated pursuant to HRS § 516–22; as such, the HFDC would not be authorized to acquire fewer lots than that statutory minimum.

### 1. *The statutory language*

After the HFDC has designated all or a portion of a development tract represented by at least the statutory minimum number of applicants pursuant to HRS § 516–22, it is required to "acquire through voluntary action of the parties, or institute eminent domain proceedings to acquire the leased fee interest in the tract or portion *so designated.*" HRS § 516–23. Thus, the statutory language indicates that the HFDC must acquire the leased fee interests in at least the statutory minimum number of lots "so designated." Nothing in the language of HRS § 516–23 suggests that the HFDC would be authorized to acquire the leased fee interests in fewer lots than the statutory minimum number prescribed in HRS § 516–22 and previously designated thereunder by the agency.[13]

### 2. *The legislative history of HRS §§ 516–22 and –23*

As noted above, when the HLRA was originally enacted in 1967, HRS §§ 516–22 and –23 required the HHA to designate and acquire the leased fee interests in the entire development tract at issue. Then, in 1975 the statutes were amended to allow the HFDC to designate a portion of a development tract and to acquire the leased fee interests in the portion so designated.

The legislative history leading up to the 1975 amendments to the HLRA provides some insight into the intent of the legislature. The Senate committee on Housing and

---

13. The statutory language also makes clear that the leased fee interests of houselots within a designated portion of a development tract need not be acquired through completion of formal condemnation. Rather, the acquisition may be accomplished by "purchase under the threat of eminent domain," HRS § 516–22, or "voluntary action of the parties." HRS § 516–23. If the leased fee interests of some of the houselots within a designated portion of a development tract are acquired through these alternative

Hawaiian Homes reported on an early draft of the bill,[14] in part, as follows:

> The purpose of this bill, as amended, is to amend Chapter 516, Hawaii Revised Statutes to provide a one-to-one condemnation of leaseholds if more than 50% of lessees in a development tract petition for conversion from lease to fee. *Only those lessees that petition are affected by the condemnation and they are required to purchase their fee title. Non-petitioning lessees are not affected.*

Sen. Stand. Comm. Rep. No. 342, in 1975 Senate Journal, at 869 (emphasis added).

The Senate Judiciary Committee later proposed amendments to the bill,[15] reporting, in part, as follows:

> Your Committee has concurred with the Committee on Housing and Hawaiian Homes in providing for a one-to-one condemnation of leaseholds if more than 50% of the lessees in a developed tract desire fee simple ownership. *Only those lessees are affected. Non-petitioning lessees are not affected.*...
>
> ....
>
> Your Committee has amended [the bill] to make the following changes in existing law:

> 1. The Hawaii housing authority is authorized to condemn portions of a development tract. This adds a maximum degree of flexibility not afforded to the authority under existing law.
>
> 2. The requirements for acquisition of a development tract are eased.... *[S]uch change is entirely consistent with* the public purpose of promoting fee simple ownership, lowering land lease rents, and breaking up monopolistic land ownership by *providing for the simultaneous conversion of sizeable numbers of leasehold lots to individual fee simple ownership.*

Sen. Stand. Comm. Rep. No. 630, in 1975 Senate Journal, at 1071. (emphases added).

These committee reports indicate that although the legislature intended to introduce a greater degree of flexibility into the HLRA by allowing for the acquisition of portions of a development tract such that the houselots of non-petitioning lessees would not be affected, it also intended that the houselots of "those lessees that petition [would be] affected" and that those petitioning lessees would be "required to purchase their fee title," thereby ensuring the "simultaneous conver-

---

means, the condemnation of the remaining leased fee interests will not be affected.

**14.** S.B. 1200, S.D.1, would have amended HRS § 516–22 to read in pertinent part as follows:

> The Hawaii housing authority may designate a development tract and acquire ... the lessor's leased fee interest in residential houselots ... if ... the authority finds that the acquisition of the lessor's leased fee interest ... in residential houselots ... will effectuate the public purposes of this chapter and shall also find
>
> (1) That a shortage of fee simple residential property exists in the county and that acquisition and disposition of the lessor's leased fee interest ... in residential houselots within the development tract ... will assist in alleviating the shortage pursuant to the purposes of this chapter, and
>
> (2) [That a sufficient number of applications were made.]

It would also have amended HRS § 516–23 to read in pertinent part as follows:

> Within twelve months after the designation of the development tract within which leased fee interests ... in residential houselots are to be acquired, the Hawaii housing authority shall ... institute eminent domain proceedings to acquire the leased fee interests ... of at

least fifty per cent of the residential houselots within the tract so designated....

**15.** S.B. 1200, S.D.2, would have amended HRS § 516–22 to read in pertinent part as follows:

> The Hawaii housing authority may acquire residential leaseholds within a development tract so designated by the authority ... if ... the authority finds that the acquisition of the residential houselots ... will effectuate the public purposes of this chapter and shall also find
>
> (1) That a shortage of fee simple residential property exists in the county and that acquisition and disposition of the residential houselots within the development tract ... will assist in alleviating the shortage pursuant to the purposes of this chapter, and
>
> (2) [That a sufficient number of applications were made.]

It would also have amended HRS § 516–23 to read in pertinent part as follows:

> Within twelve months after the designation of the development tract within which residential houselots are to be acquired, the Hawaii housing authority shall ... institute eminent domain proceedings to acquire at least fifty per cent of the residential houselots within the tract so designated....

sion of sizeable numbers of leasehold lots to individual fee simple ownership."

### 3. *Ancillary provisions of the HLRA*

Other provisions in the HLRA and its legislative history are consistent with the proposition that the legislature intended and expected that the HFDC would be required to acquire the leased fee interests in at least the statutory minimum number of houselots in the designated portion of the development tract prescribed in HRS § 516–22, regardless of whether individual lessees became unable or unwilling to purchase the leased fee interests of their lots.

For example, HRS § 516–83 recognizes that the monies necessary for "the payment of just compensation" in a condemnation proceeding under the HLRA will come "through the issuance of bonds,[16] the expenditure of general revenue funds, and the use of private funds[17] which are at the disposal of the State." Given the alternative sources of funds, it is apparent that the legislature did not expect that only those leased fee interests for which lessees were able to provide all of the just compensation would be condemned; if that were the expected result, the other sources of funds would be wholly unnecessary.

In addition, HRS § 516–28 (1993) provides in part that "[w]here necessary ..., the corporation may lease the residential lots" that it has acquired. This provision implicitly recognizes that there will be leased fee interests that the HFDC acquires that the lessees will not be able or willing to purchase. In this context, it is worth noting that when the legislature amended the HLRA to allow for acquisition of portions of development tracts, it did so in an attempt "to *minimize* the authority's potential role as lessor." Sen. Conf. Comm. Rep. No. 24, in 1975 Senate

Journal, at 863 (emphasis added). The legislature evidently was aware that it was not completely eliminating the HHA's potential role as lessor under the statutory scheme, but sought only to *minimize* that potential.

Further evidence of the legislature's awareness and expectation that the HFDC would be required to acquire the leased fee interests of lots even if the lessees became unwilling or unable to purchase them from the HFDC is found in HRS § 516–30 (1993), which provides in pertinent part:

> **Purchase of leased fee interest.** The lessee of a residential lot within a development tract, whether the lessee was a lessee at the time of the acquisition or became a lessee after the acquisition of the development tract, who has applied to the corporation and has qualified for purchase of the leased fee interest shall purchase from the housing finance and development corporation by contract within sixty days of acquisition of the interest by the corporation, the leased fee interest to the lot[;] ... *provided that should any of said lessees fail or refuse to enter into such a contract, then in such event, each such lessee shall pay to the corporation the lessee's pro rata share of all costs incurred by the corporation in the acquisition of the houselots within the development tract ....*

(Emphasis added.)

C. *The fact that lessees are individually named as defendants does not authorize the circuit court to enter separate judgments.*

■ Finally, we note that the mere fact that lessees whose lots are designated by the HFDC are individually named as defendants in the condemnation action pursuant to HRS § 516–56 (1993)[18] does not give the circuit

---

**16.** HRS § 516–45 (1993) provides in part:
 The director of finance may, from time to time, issue general obligation bonds in such amounts as may be authorized by the legislature, for the purpose of acquisition by the housing finance and development corporation of residential houselots within development tracts pursuant to chapter 516....

**17.** The "private funds" are presumably the funds provided by the lessees who seek to purchase the leased fee interests of their lots.

**18.** HRS § 516–56 provides:

 **Eminent domain trial.** The parties to the eminent domain action brought under this chapter shall be the [HFDC] as plaintiff and the lessees and all other necessary parties as defendants. The [HFDC] does not have the burden of proof in establishing the fair market value of the leased fee interest being acquired. Instead, all parties, including the [HFDC], shall be given an opportunity to present evidence of the fair

court the authority to enter separate judgments with respect to each houselot. Although the lessees are not merely nominal parties, *see Hawai'i Housing Authority v. Uyehara,* 77 Hawai'i 144, 148, 883 P.2d 65, 69 (1994), the legislative history of HRS § 516–56 makes clear that the primary reason that they are named as defendants is to allow them to present evidence regarding the fair market value of the leased fee interests of their lots. When HRS § 516–56 was first enacted, the Senate standing committee on Housing and Urban Development reported in part as follows:

> The bill further clarifies the position of lessees in chapter 516 eminent domain trials by requiring the Hawaii Housing Authority to be named as plaintiff and lessees, along with all necessary parties, to be named as defendants. *This affords all parties, including lessees, the opportunity to present evidence during trials.*

Sen. Stand. Comm. Rep. No. 675, in 1983 Senate Journal, at 1344 (emphasis added). *See also Lyman,* 68 Haw. at 73, 704 P.2d at 899 ("In 1983 the legislature amended the Act to make explicit that the lessees shall be a party to proceedings under the Act and that they must be given the opportunity to present valuation evidence.").

Because the lessees will be expected to purchase the leased fee interests of their lots from the HFDC after acquisition by the HFDC, and can be penalized for failing to do so, *see* HRS § 516–30, they have an interest in ensuring that the value set for the leased fee interests is fair. For similar reasons, we held that the lessee in *Uyehara, supra,* had standing to move to set aside a settlement in a chapter 516 condemnation action, where the settlement established the price that the lessee would have to pay to purchase the leased fee interest of his lot. In all other respects, however, the HFDC is the real party in interest. The HFDC decides whether to designate development tracts or portions thereof. The HFDC decides whether to institute condemnation proceedings. And the HFDC is liable for the award of condemnation. *See Lyman,* 68 Haw. at 77, 704 P.2d at 901 ("the HHA as plaintiff-con-

market value of the leased fee interest being

demnor will be the party bearing liability, if any, for the award").

## D. *Our interpretation of the HLRA should not substantially impede the acquisition of leased fee interests.*

■ Because the HFDC is required to acquire and dispose of the leased fee interests of at least that number of houselots represented by statutory minimum number of applicants that it designates, if, after a portion of a development tract has been designated pursuant to HRS § 516–22, the class of lessees whose houselots have been designated falls below the statutory minimum number of applicants for whatever reason, the HFDC will be required to terminate the proceedings (and start again with a new designation only if enough qualified lessees can be found). The lessees contend that such a requirement "will effectively prevent any further condemnations under Chapter 516."

We recognize the difficulties facing the HFDC under our interpretation of the HLRA. For example, if the HFDC terminates the proceedings after designation but prior to commencement of the condemnation action, the HFDC will be required to "reimburse the fee owner, the lessor and the legal and equitable owners of the land ... for actual out-of-pocket expenses of appraisal, survey, and attorney fees as the owner, the lessor, and the legal and equitable owners may have incurred as a result of the designation." HRS § 516–23. Similarly, if the HFDC terminates the proceedings after the condemnation action has commenced, the HFDC will be required to pay "all damages as may have been sustained by the defendant by reason of the bringing of the proceedings ... including the defendant's costs of court, a reasonable amount to cover attorney's fees paid by the defendant in connection therewith, and other reasonable expenses[.]" HRS § 101–27 (1993). On the other hand, if the HFDC presses on with the condemnation, it will have to acquire the funds to pay

acquired.

the awarded compensation from sources other than the lessee.[19]

Obtaining the necessary funds to meet its obligations should not present insurmountable problems because, as noted above, the HFDC has alternative sources of funds available to it, namely general obligation bonds, *see* HRS § 516–45 (1993), and general revenue funds, *see* HRS § 516–83, as well as income derived from the lease or sale of previously acquired leased fee interests. *See* HRS §§ 516–28, –32 (1993).

Moreover, if the HFDC opts not to terminate the proceedings, once payment is made, the HFDC will become the owner of the leased fee interests that any lessees fail to purchase. The HFDC may continue collecting lease rentals from the lessees, *see* HRS §§ 516–28, –31 (1993), or it may sell the leased fee interests, provided that "it has published on at least two different days in a newspaper of general circulation in the county, a notice of its intent to sell or lease," HRS § 516–29 (1993), and "further provided that the sales price shall be at the lowest possible price consistent with" the HFDC's not-for-profit mission.[20] HRS § 516–30. Given these options, the implementation of the HLRA should not be substantially impeded under the interpretation that we adopt today.

### III. *CONCLUSION*

For the foregoing reasons, we hold that the circuit court erred when it entered thirty-two separate final judgments pursuant to HRCP Rule 54(b). Accordingly, we vacate the three judgments that remain in this ac-

---

**19.** Pursuant to HRS § 516–30, however, the HFDC can recover from any lessee who fails or refuses to enter into a contract to purchase the leased fee interest of his or her houselot "the lessee's pro rata share of all costs incurred by the corporation in the acquisition of the houselots within the development tract including but not limited to appraisal costs, costs of publication, and survey[.]"

**20.** Thus, the circuit court's COL No. 8 was not wrong, and we reject the Trustees' contention that the HFDC may not sell the leased fee interests that it acquires to persons other than those who originally applied or those who were officially substituted for those persons pursuant to the HFDC's administrative rules.

tion and remand for proceedings consistent with this opinion.

NAKAYAMA, Justice, dissenting.

For the reasons set forth below, I disagree with the majority's holding that "the circuit court erred when it entered thirty-two separate final judgments pursuant to HRCP Rule 54(b)." Majority at 104. Accordingly, I dissent.

### A. *Entry of Thirty-two Separate Judgments*

As stated by the majority, the Trustees argue that "the collective result" of the circuit court's COL and its entry of thirty-two separate judgments, each of which is subject to a separate final order of condemnation, is that the "HFDC may condemn as few as one lot, even if the Lessee of that lot does not qualify [to purchase the lot] under [HRS] § 516–33." [1] Majority at 97. The Trustees contend, and the majority agrees, that such a result violates HRS Chapter 516, which they claim requires the HFDC to acquire and resell to qualifying lessee-applicants a minimum of twenty-five leased fee interests in a given development tract. The Trustees further argue that strict compliance with the requirements of HRS Chapter 516 is a necessary condition to satisfaction of the constitutional public use requirement; therefore, the possibility that the HFDC will acquire fewer than the minimum twenty-five leased fee interests violates the Hawai'i and United States Constitutions.

As presented on appeal, and focused on by the majority, the validity of the Trustees'

---

**1.** HRS § 516–33 (Supp.1992) sets forth criteria that a person must meet before the "sale of any residential houselot within a development tract shall be made[.]" Among other things, the person must be at least eighteen years of age, a bona fide resident of Hawai'i or have a bona fide intent to reside in the development tract, and have a "letter of credit, certificate of deposit, proof of funds, or approved application from any lending institution demonstrating that the person will be able to promptly pay the [HFDC] for the leased fee interest in the lot[.]" The criteria now must be met at the time of sale and at the time the lessee submits his/her application to purchase the leased fee interest. HRS § 516–33 (1993 Compilation).

arguments turns on whether HRS Chapter 516 establishes a "minimum lot" requirement—*i.e.*, requires the HFDC to acquire a minimum number of leased fee interests in a given development tract. The majority holds that HRS § 516–22 sets the minimum lot requirement. As noted, HRS § 516–22 permits the HFDC to designate for acquisition and to acquire the leased fee interests in the residential houselots in a development tract

> after twenty-five or more lessees or the lessees of more than fifty per cent of the residential lease lots within the development tract, whichever number is the lesser, have *applied* to the [HFDC] to purchase the leased fee interest in their residential leasehold lots pursuant to section 516–33 and if ... the [HFDC] finds that the acquisition of the leased fee interest in residential houselots in all or part of the tract through exercise of the power of eminent domain or by purchase under threat of eminent domain and the disposition thereof, as provided in this part will effectuate the public purpose of this chapter.

(Emphasis added.)

The majority agrees with the Trustees that, because receipt of a minimum number of applications is a condition precedent to the commencement of condemnation proceedings under HRS Chapter 516, and because the Act was designed to achieve "the simultaneous conversion of sizeable numbers of leasehold lots to individual fee simple ownership[,]" Sen. Conf. Comm. Rep. No. 630, in 1975 Senate Journal, at 1071, it logically follows that the minimum number requirement should apply to each phase of the process. That is, the HFDC must designate for condemnation, acquire, and then re-sell to qualifying lessee-applicants at least the minimum number of leased fee interests. The trustees argue that, to hold otherwise, the minimum application requirement is "irrelevant" and "superfluous" and the purpose of the statute would be frustrated.

The majority also points to HRS § 516–23 (1985 & Supp.1992), which provides in part that "[w]ithin twelve months after the designation of all or part of the development tract for acquisition, the [HFDC] shall acquire through voluntary action of the parties, or institute eminent domain proceedings to acquire the leased fee interests in the tract or portion so designated." The majority interprets this as meaning that HRS § 516–23 does not permit acquisition by the HFDC of less than the statutory minimum number of lots that can support a designation and public purpose finding under HRS § 516–22.

I disagree with the majority's holding and the Trustees' arguments. HRS § 516–22 makes receipt of a minimum number of *applications* a prerequisite to condemnations under HRS Chapter 516.[2] Among other things, the requirement functions as a presumption that the residential fee simple market is malfunctioning due to the disproportionate concentration of land ownership. *See Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 242, 104 S.Ct. 2321, 2330, 81 L.Ed.2d 186 (1984) ("The [Land Reform] Act presumes that when a sufficiently large number of persons declare that they are willing but unable to buy lots at fair prices the land market is malfunctioning."). Once the filing of the minimum number of applications triggers the presumption, HRS § 516–22 authorizes the HFDC to designate "all or a portion of" the development tract for acquisition. The HFDC's designation is subject to only one condition: after due notice and a public hearing, the HFDC must find that the acquisition of the leased fee interests in the residential houselots in all or part of the tract will effectuate the purposes of the Act. The statute does not expressly require the HFDC to designate a minimum number of leased fee interests for condemnation. It simply requires the HFDC to make a separate finding that the acquisition of the designated leased fee interests in the tract, or a portion thereof, will further the purposes of the Act.[3]

2. As noted, under HRS § 516–22, the HFDC must receive applications from "twenty-five or more lessees or the lessees of more than fifty per cent of the residential lease lots within the development tract, whichever number is the lesser,"

before it can commence condemnation proceedings. All of the parties agree that the minimum number in this action was twenty-five.

3. The HFDC's finding that the acquisition of all or part of the development tract would effectuate

Neither do I discern any language in HRS § 516–23 expressly requiring the HFDC to acquire the leased fee interests in a minimum number of lots. HRS § 516–23 requires only that within a year of the designation, the HFDC acquire or institute eminent domain proceedings to acquire the leased fee interests designated for acquisition.

I would also conclude that the statutes do not implicitly evidence a legislative intent requiring the HFDC actually to condemn a minimum number of lots. The majority adopts the Trustees argument that a minimum number of lots must be condemned in order to effectuate the purposes of HRS Chapter 516.

> "[The] stated intent [of HRS Chapter 516] is to increase the availability, alienability and turnover of single family residential lots, spread ownership of fees simple, disperse the oligopolistic market power of the large landowners, and stabilize land prices, inflation, and the state's economy by containing the cost of living and the cost of public assistance."

*Lyman*, 68 Haw. at 64, 704 P.2d at 893 (citations omitted). I see no reason why, as a matter of law, a minimum number of lots must be condemned in order to effectuate those purposes. To the contrary, given the Act's central purpose of redistributing and dispersing the ownership of residential land in fee simple, the HFDC could rationally and justifiably find that the actual condemnation of "as few as one lot" would effectuate the purposes of the Act.

Of course, there may be instances where the effectuation of the public purposes of the Act will depend, as a matter of fact, on the condemnation of a minimum number of lots. That is, there may be specific cases where, pursuant to HRS § 516–22, the HFDC finds that the purposes of the Act will not be furthered unless a minimum number of leasehold interests in a given development tract are actually condemned.

This, however, is not a case where the HFDC found that the purposes of HRS Chapter 516 would be effectuated only if a certain number of leasehold interests were condemned. The HFDC found that the acquisition of "the leased fee interest[s] in the residential houselots *in all or part* of the Haiku Knolls Subdivision" would effectuate the public purposes of the Act. I perceive nothing in the record to indicate that the HFDC found, as a matter of fact, that the acquisition of a minimum number of leased fee interests was necessary to effectuate the purposes of the Act. I therefore presume that the HFDC found that the acquisition of the leased fee interest in *any* of the residential houselots in the subdivision would effectuate the purposes of the Act. Because HRS Chapter 516 does not require the acquisition of a minimum number of leased fee interests, the HFDC is not precluded from making that finding.

In sum, I believe that HRS Chapter 516 does not require the HFDC actually to acquire a minimum number of leasehold interests by eminent domain in order to effectuate the purposes of HRS Chapter 516. Inasmuch as the majority concurs with the Trustees' basic argument on appeal that COL Nos. 1, 7, 8, and 10 are wrong because, collectively, they permit the HFDC to acquire fewer than the twenty-five leasehold interests, I reject that argument. I therefore would hold that COL Nos. 1, 7, 8, and 10 were not wrong and that the circuit court did not err in entering thirty-two separate judgments pursuant to HRCP 54(b).

### B. *Blight of Summons Damages*

The majority chose not to address the Trustees' blight of summons argument because they "are vacating the judgments with respect to the houselots that remain in this appeal." Majority note 1. However, because I reject the majority's analysis and would

the purposes of HRS Chapter 516 is subject to review in proceedings under HRS § 101–34, where the owners of designated land can "contest the public use, ... includ[ing] a contest of whether or not the prerequisites to such a condemnation set forth in the various provisions of HRS Chapter 516 such as the size of the tract,

the number of persons *applying*, etc., have been met." *Takabuki v. Housing Finance and Development Corp.*, 72 Haw. 466, 468, 822 P.2d 955, 956 (1991) (emphasis added); *see also Housing Finance and Development Corp. v. Castle*, 79 Hawai'i 64, 89–90, 898 P.2d 576, 601–02 (1995).

hold otherwise, I believe that the Trustees' blight of summons argument is relevant and should be addressed.

As previously indicated, between January 28, 1993 and May 7, 1993, deposits were made with respect to six of the houselots. The Trustees argue that COL No. 5 is wrong because "a deposit of money with the court that is conditional will not stop the accrual of blight of summons damages" and "any deposit that is made in a Chapter 516 action before the time of sale to the respective Lessee is very much conditional on the subsequent qualification of the Lessee." I reject the Trustees' argument.

There is no dispute that the Trustees are entitled to blight of summons damages as part of the just compensation owed to them for the taking of their property. *Midkiff,* 69 Haw. at 250–51, 739 P.2d at 250–51. In addition, none of the parties challenge the interest rate at which the blight of summons damages accrue. The only question is whether the blight of summons damages should stop accruing after the funds were deposited with the clerk of the circuit court.

I initially note that I agree with the Trustees that HRS §§ 101–28 through 101–33 do not supply the answer to that question. In general terms, HRS §§ 101–28 through 101–33 govern the procedures by which a condemning authority, in *ordinary* condemnation actions, may gain possession of condemned property after the date of summons but before the condemnation proceedings have been completed. "In order to do this, the condemning authority has to deposit what it, in good faith, estimates the compensation for the property condemned to be, and the owner, if there are no tax liens outstand-

ing, can usually draw down that deposit." *Housing Finance and Dev. Corp. v. Castle,* 72 Haw. 383, 384, 819 P.2d 82, 83–84 (1991). In *Castle,* we indicated that, because "condemnations under [HRS] Chapter 516 are handled very differently" from ordinary condemnations, HRS §§ 101–28 through 101–33 were inapplicable to HRS Chapter 516 condemnations. *Id.* at 385, 819 P.2d at 84. Thus, I would hold that HRS § 101–33 (1985),[4] which limits the accrual of blight of summons damages after the condemning authority makes the appropriate deposit with the clerk of the court, does not control the disposition of the instant case. The Lessees and the HFDC do not contend otherwise.

Instead, the Lessees and the HFDC argue that their deposits were made pursuant to HRS 101–25 (1985)[5] and represented payment of the amounts owed as per the final judgments entered by the circuit court—*i.e.,* the fair market value of the respective lots as determined by the jury's special verdict, plus accrued blight of summons damages. Further, the Lessees and the HFDC take the position that the deposited funds "are available for withdrawal by the Trustees without condition." Lessees' answering brief at 8; HFDC's answering brief at 14. They contend that the Trustees' argument that their ability to withdraw the deposited funds is "conditional on the subsequent qualification of the Lessee," is mistaken because "all six lessees who deposited with the court were deemed qualified by the HFDC at the time of deposit." More importantly, they concede that, even if the lessees had yet to be qualified, the Trustees would still be able to withdraw and use the funds without restriction.[6]

---

4. HRS § 101–33 provides, in pertinent part:
 If an order is made letting the plaintiff into possession as provided for in sections 101–28, 101–29, and 101–32, the final judgment shall include, as part of the just compensation and damages awarded, interest at the rate provided in section 101–25 from the date of the order until paid by the plaintiff; *provided that except in the case of an appeal by the plaintiff as provided in section 101–32, interest shall not be allowed upon any sum paid by the plaintiff to the clerk of the court from the date of payment.* (Emphasis added.)

5. HRS 101–25 provides in part that "[t]he plaintiff shall within two years after final judgment

pay the amount assessed as compensation or damages.... The payment shall be made to the clerk of the court rendering the judgment."

6. I understand the Lessees' and the HFDC's position that the deposited funds "are available for withdrawal by the Trustees without condition" as meaning just that—*i.e.,* that the Trustees are entitled, upon making an appropriate motion in the circuit court, to withdraw and use the deposited funds without condition, as if they constituted final payment of the just compensation owed for the taking of the respective leased fee interests. Thus, by withdrawing the deposited funds, the Trustees would not be waiving or abandoning

Thus, they aver that "any dispute arising from the failure of the lessee to qualify is a dispute between the lessee and the HFDC, not between the lessee and the Trustees."

Given the Lessees' and the HFDC's concession that the Trustees are entitled to withdraw the deposited funds without condition—*i.e.*, without regard to whether the Lessees are ultimately qualified to purchase the lots in question—I see no reason why the blight of summons damages should not stop accruing on the date the funds are deposited with the clerk of the court. As we stated in *Market Place, Ltd.*, blight of summons damages represent the "indemnification due a condemnee for the damages resulting from the government's delay in paying the full cash equivalent of the property taken on the date of summons[,]" 55 Haw. at 235, 517 P.2d at 15, and their purpose "is to compensate a condemnee for the loss of use of the cash equivalent of the taken property[.]" *Id.* at 237, 517 P.2d at 16. The deposits made by the HFDC represented the cash equivalent of the property taken (plus accrued blight of summons damages). Stated otherwise, even though the funds were deposited prior to entry of the final judgment, *State v. Heirs of Kapahi*, 50 Haw. 237, 240, 437 P.2d 321, 323 (1968) (final judgment means judgment that is entered after disposition of appeal to the supreme court), they were equivalent to payment of "the amount[s] assessed as compensation or damages." HRS § 101–25. Thus, as long as the Trustees were entitled to withdraw and use those funds unconditionally, *see Market Place, Ltd.*, 55 Haw. at 239, 517 P.2d at 17 (only an unconditional deposit of funds "stop[s] the running of interest as blight of summons damages"), they could have completely mitigated the accrual of any further damages resulting from "the loss of use of the cash equivalent of the taken property[.]"[7] *Id.* at 237, 517 P.2d at 16.

Because the Lessees and the HFDC concede that the funds were available for the Trustee's unconditional withdrawal and use, the only reason blight of summons damages continued to accrue was the Trustees' failure to make a request to withdraw the funds. Under those circumstances, I would hold that the circuit court's conclusion that the blight of summons damages should stop accruing on the date the funds were deposited was not incorrect. *See Castle*, 72 Haw. at 385, 819 P.2d at 84 ("blight of summons damages should be measured from the date of summons to the date of payment").

For the foregoing reasons, I would hold that COL Nos. 1, 5, 7, 8, and 10 are not wrong and that the circuit court did not err in entering thirty-two separate judgments; therefore, I would affirm the judgments of the circuit court. Accordingly, I dissent.

---

any defenses they may have to the condemnation action. *Cf.* HRS § 101–32 (1985) (if the defendant who is entitled to the compensation deposited with the circuit court appeals to the supreme court, the defendant can demand and receive payment of the deposited funds "at any time thereafter, upon filing a receipt therefor and an abandonment of all defenses to the action or proceeding except as to the amount of compensa-

tion or damages that the defendant may be entitled to if a new trial shall be granted").

7. In my view, the fact that the Trustees may, at some point, have to return the deposited funds as restitution if the HFDC does not acquire the respective leasehold interests does not render the Trustees' ability to withdraw the funds conditional.